835 So.2d 318 (2002)
JACKSON COUNTY HOSPITAL CORPORATION d/b/a Jackson Hospital, Appellant/Cross-Appellee,
v.
Darlene ALDRICH and Michael Coniglio as Co-Representatives of the Estate of William E. Roddenberry, Jr., on Behalf of the Estate and Survivors, Appellees/Cross-Appellants; and
Bay Anesthesia, Inc., Appellant/Cross-Appellee,
v.
Darlene Aldrich and Michael Coniglio as Co-Representatives of the Estate of William E. Roddenberry, Jr., on Behalf of the Estate and Survivors, Appellees/Cross-Appellants.
Nos. 1D01-4079, 1D01-4042.
District Court of Appeal of Florida, First District.
December 27, 2002.
Rehearing Denied January 27, 2003.
*321 G. Bruce Hill and Daniel S. Green, of Hill, Adams, Hall & Schieffelin, P.A., Winter Park, for Appellant/Cross-Appellee Jackson Hospital.
V. James Facciolo, of Hayden & Facciolo, P.A., Fernandina Beach, for Appellant/Cross-Appellee Bay Anesthesia, Inc.
*322 Donald M. Hinkle, of Hinkle & Foran, Tallahassee; and Louis K. Rosenbloum, of Louis K. Rosenbloum, P.A., Pensacola, for Appellees/Cross-Appellants.
LEWIS, J.
As these two cases originated from one trial and as many of the factual and legal issues apply in both cases, we have consolidated the two cases for purposes of this opinion. Appellant Jackson Hospital ("JH") challenges the jury verdict finding it liable for the reckless disregard of one of its emergency room physicians. JH raises two issues on appeal. JH argues that the trial court erred in failing to grant its motions for directed verdict, motion for new trial, and motion for judgment notwithstanding the verdict as the evidence presented at trial was legally insufficient to prove both reckless disregard and causation. In viewing the facts in the light most favorable to appellees, Darlene Aldrich and Michael Coniglio ("appellees"), the co-representatives of the estate of William E. Roddenberry ("Roddenberry"), we conclude that the trial court erred in denying JH's motions for directed verdict and motion for judgment notwithstanding the verdict. We, therefore, reverse and remand for entry of judgment in favor of JH. We affirm JH's other argument on appeal without further discussion.
Appellant Bay Anesthesia, Inc. ("Bay") raises three issues on appeal.[1] Bay first argues that the reckless disregard standard set forth in section 768.13(2)(b)1., Florida Statutes (1997), applies to its contract nurse anesthetist who provided care to a critically burned patient in JH's emergency room. In addition to this argument, Bay contends that unless section 768.13(2)(b)1. is construed to extend to contract health care providers who provide care in hospitals, such denial would violate the constitutional protection of equal protection. We affirm on this issue and hold that because Bay's contract nurse anesthetist is not a member of any of the classes clearly enumerated in section 768.13(2)(b)1., Bay was properly held to the lesser standard of negligence. We affirm Bay's second and third arguments without further discussion. Appellees argue on cross-appeal that if this Court affirms liability as to either JH or Bay but reverses as to the other, the party for whom the liability has been affirmed should be responsible for 100 percent of appellees' damages. Because we reverse the judgment as to JH and affirm liability as to Bay, we agree with appellees and hold that Bay is responsible for 100 percent of appellees' damages. Accordingly, we reverse the judgment against Bay for forty percent of appellees' damages and remand with instructions that the trial court enter judgment against Bay for 100 percent of the jury's damages award.

I. Factual Background

Both cases arose from a wrongful death complaint filed against appellants by appellees on behalf of Roddenberry. Roddenberry was severely burned at his place of employment when he used a cutting torch on a barrel containing flammable liquid. Following the initial explosion that occurred, Roddenberry was engulfed in flames for approximately thirty seconds. As a result, he suffered second and third degree burns over eighty-five percent of his body. A paramedic arrived at the scene of the accident shortly thereafter and transported Roddenberry to JH in order that he could be stabilized while waiting to be transported by helicopter to a major burn institution.
*323 Roddenberry arrived at JH at 9:50 a.m., approximately thirty-five minutes after the paramedic had initially arrived at Roddenberry's place of employment. A Foley catheter was immediately inserted into Roddenberry's bladder, indicating clear urine. However, despite having received 100 percent oxygen for thirty minutes in the ambulance, Roddenberry's arterial blood-gas level was only 66.2 and he was noted to be breathing twenty-eight times per minute as compared with the normal rate of twelve to fourteen respirations per minute. These levels indicated that Roddenberry was suffering from severe oxygen deprivation. As such, Dr. Griffin, JH's emergency room physician, decided that Roddenberry required an endotracheal intubation. Thus, Teresa Cruce, a certified registered nurse anesthetist ("CRNA") employed by Bay, was called to the emergency room to perform the intubation. Cruce was working at JH pursuant to a contract between JH and Bay. Pursuant to this contract, JH and Bay agreed that Bay at all times would act as an independent contractor and not as a partner of JH. The anesthetists were not permitted to act or hold themselves out to third parties as a partner, employee, or agent of JH.
At trial, Cruce testified that, after assessing Roddenberry's condition, she was unable to see Roddenberry's vocal cords due to the swelling in his upper airway and the burns, which were particularly severe around his neck and face. These burns prevented Cruce from being able to tilt Roddenberry's head to look down his airway. Roddenberry's short mandible also added to Cruce's difficulty in seeing his vocal cords. Although Cruce recommended a nasal intubation as Roddenberry would still be conscious and able to breathe independently, Dr. Griffin instructed her to conduct a rapid sequence oral tracheal intubation. To do so, Cruce administered a paralytic agent to Roddenberry that, while preventing aspiration, caused Roddenberry to be entirely dependent upon the intubation tube for his oxygen supply.
Unable to see Roddenberry's vocal cords, Cruce performed a "blind" intubation at 10:07 a.m., according to the notes recorded by an emergency room nurse who used her own watch to gauge the time. Because Cruce was not entirely certain that she had properly placed the intubation tube into Roddenberry's trachea, as opposed to his esophagus, she informed Dr. Griffin of her uncertainty. At this time, a respiratory technician informed the medical team working on Roddenberry that a carbon dioxide detector was not detecting the emission of carbon dioxide, which would be present if Roddenberry's lungs were receiving oxygen. Therefore, Dr. Griffin, Cruce, another physician in the emergency room, and other members of the medical team took steps to alleviate their concerns about proper placement of the intubation tube. The medical team, listening to Roddenberry's lungs, heard bi-lateral breathing sounds and saw his chest expand and contract. Moreover, Dr. Griffin ordered an x-ray and listened to Roddenberry's stomach for sounds of oxygen possibly being pumped into his stomach rather than into his lungs. Dr. Griffin and another physician examined the x-ray and determined that it established that the intubation tube was in the correct place, the trachea. Furthermore, although Roddenberry's oxygen saturation levels did not increase following the intubation, which would be expected if the intubation tube was properly placed, Roddenberry's levels did not decrease either, which would be expected if the intubation tube was improperly placed. As a result of the foregoing, both Dr. Griffin and Cruce were convinced that Cruce had properly placed the *324 intubation tube into Roddenberry's trachea.
Seven minutes after Cruce inserted the intubation tube, Roddenberry's urine changed from a clear color to a reddish color. Red urine in a burn victim can indicate either a fatal condition known as hemolysis, which is caused by the breakdown of the burn victim's red blood cells, or a non-fatal condition known as rhabdomyolysis, which is caused by the breakdown of the burn victim's muscle pigment. At trial, no expert for either side testified as to which of the two conditions, if not both, caused Roddenberry's urine to turn red in color. Yet, all experts agreed that if, in fact, Roddenberry had been suffering from hemolysis, such a condition would be fatal. Although the lab report indicated that Roddenberry's blood sample, taken subsequent to the discovery of the red urine, was badly hemolyzed, experts for both appellants and appellees testified that this finding could have indicated some other interference with the interpretation of the results, such as elevated potassium levels.
Nineteen minutes after Cruce inserted the endotracheal tube, morphine was administered to Roddenberry. Twenty-three minutes after Cruce inserted the endotracheal tube, Roddenberry had no pulse, which led the medical team to begin cardiopulmonary resuscitation. As their efforts were unsuccessful, Roddenberry was declared dead shortly thereafter.
During the autopsy, which the medical examiner performed the following day, the examiner found the endotracheal tube in Roddenberry's esophagus. Although the examiner found some evidence of damage to Roddenberry's lungs, she did not have lung samples examined to ascertain the extent of the inhalation injury. The examiner also did not determine whether the red urine had been caused by hemolysis or rhabdomyolysis. According to the examiner, Roddenberry's cause of death was morphine poisoning which caused him to go "over the edge" when he was already hypoxic from the esophageal intubation.
At trial, Dr. DeRespino, appellees' expert on emergency medicine, testified that he believed Roddenberry sustained a serious but survivable burn. However, Dr. DeRespino was not qualified as an expert for determining Roddenberry's chances of long-term survival. According to Dr. DeRespino, Roddenberry died because of the improper intubation. In order to explain the fact that it would have taken only ten or eleven minutes for Roddenberry to suffer cardiac arrest after having the intubation tube placed into his esophagus, while he was found with no pulse twenty-three minutes after intubation, Dr. DeRespino opined that no member of the medical team realized that Roddenberry had arrested until 10:30 a.m. Dr. DeRespino also opined that one cannot put too much faith in the time reports that were generated as the machines may have been programmed differently and as different watches may have been used. Regarding whether or not Dr. Griffin acted with reckless disregard, Dr. DeRespino testified that although he did not think that listening for breath sounds and making an honest error in judgment demonstrated reckless disregard, Dr. Griffin's failure to check for Roddenberry's vocal cords himself and his failure to notice that Roddenberry's oxygen saturation levels were not rising did evidence reckless disregard.
Appellees' burn expert, Dr. Briggs, testified that Roddenberry had an eighty-five percent burn that in most major institutions in this country carries a ninety percent survivability rate. On cross-examination, Dr. Briggs admitted that this survival prediction was based upon people who actually reached major burn institutions. *325 Dr. Briggs also admitted that, in her deposition, she had stated that she had never seen anyone survive hemolysis. Although Dr. Briggs testified during trial that Roddenberry did not have hemolysis, she then stated that the measure of hematocrit in his blood did not "rule out any hemolysis... but it certainly rules out any significant hemolysis." However, notwithstanding her prior testimony that she had never seen anyone survive hemolysis, Dr. Briggs failed to differentiate between what she termed "significant hemolysis" and all other, if any, severity levels of the condition. On re-direct examination, Dr. Briggs testified that Roddenberry had a survivable injury.
Following the close of appellees' evidence, JH moved for a directed verdict as to all issues, arguing that appellees' evidence was such that reasonable men would not differ, which the trial court denied. Bay argued that section 768.13, Florida Statutes (1997), and its reckless disregard standard should be applied to Cruce, which the trial court also denied. JH and Bay then presented their expert witnesses.
Dr. Tompkins, JH's burn expert, testified that, in his opinion, Roddenberry suffered from a very severe inhalation injury. According to Dr. Tompkins, Roddenberry's bi-lateral breathing after intubation was inconsistent with an esophageal intubation. Dr. Tompkins opined that Cruce had properly intubated Roddenberry in the trachea, as there would be no other way to explain Roddenberry's relatively stable vital signs that lasted twenty-three minutes until he suffered cardiac arrest. Dr. Tompkins also opined that the port red wine color of the urine, which is how some of the experts described such, indicated very severe damage. Thus, according to Dr. Tompkins, Roddenberry had a ten percent or lower chance of survival. Appellants' other expert witnesses similarly testified that Roddenberry was properly intubated and died from his burns. Although the autopsy revealed that the tube was in Roddenberry's esophagus, appellants introduced expert testimony regarding the possibility that the intubation tube had loosened due to the severe burns, which, according to the expert testimony, was demonstrated in the autopsy photographs that showed that the tube had moved at least three centimeters since its original placement.
Thereafter, appellants rested and JH again moved for a directed verdict, which the trial court denied. The trial court determined that the proper standard of care for JH was reckless disregard, whereas the proper standard of care for Bay was negligence. The jury found that JH acted with reckless disregard as to Roddenberry and that Bay acted negligently. It assigned sixty percent of the fault to JH and forty percent of the fault to Bay. In the hearing on appellants' post-trial motions, which included a motion for judgment notwithstanding the verdict as to both reckless disregard and causation, the trial court, while noting that it thought the verdict should be reversed for many reasons and stating that, "I didn't see the evidence," denied the motions for judgment notwithstanding the verdict and for a new trial. These appeals followed.

II. Jackson Hospital

JH argues on appeal that the trial court erred in denying its motions for a directed verdict, motion for new trial, and motion for judgment notwithstanding the verdict because the evidence introduced by appellees at trial was insufficient to prove both reckless disregard, as set forth in section 768.13(2)(b)1., and causation. When presented with a motion for directed verdict, a court must view all the evidence in a light most favorable to the non-movant, and in the face of evidence *326 which is at odds or contradictory, all conflicts must be resolved in favor of the party against whom the motion has been made. Ticor Title Guarantee Co. v. Harbin, 674 So.2d 781, 782 (Fla. 1st DCA 1996). It is only where there is no evidence upon which a jury could properly rely, in finding for the non-moving party, that a directed verdict should be granted. Id. The same standard applies when a court addresses a motion for judgment notwithstanding the verdict. Easton-Babcock & Assocs., Inc. v. Fernandez, 706 So.2d 916, 919 (Fla. 3d DCA 1998). A judgment must be sustained if it is supported by competent, substantial evidence. Jones v. Rives, 680 So.2d 450, 451 (Fla. 1st DCA 1996). This is the test used by the trial court as well as the standard of review on appeal. Cecile Resort, Ltd. v. Hokanson, 729 So.2d 446, 447 (Fla. 5th DCA 1999).

A. Reckless Disregard

In 1988, the Legislature amended the Good Samaritan Act to say, in pertinent part:
Any hospital licensed under chapter 395, any employee of such hospital working in a clinical area within the facility and providing patient care, and any person licensed to practice medicine who in good faith renders medical care or treatment necessitated by a sudden, unexpected situation or occurrence resulting in a serious medical condition demanding immediate medical attention, for which the patient enters the hospital through its emergency room or trauma center, shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failing to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another.
§ 768.13(2)(b)1., Fla. Stat. The term "reckless disregard" as it is used in section 768.13(2)(b)1., is defined as:
conduct which a health care provider knew or should have known, at the time such services were rendered, would be likely to result in injury so as to affect the life or health of another, taking into account the following to the extent they may be present;
a. The extent or serious nature of the circumstances prevailing.
b. The lack of time or ability to obtain appropriate consultation.
c. The lack of a prior patient-physician relationship.
d. The inability to obtain an appropriate medical history of the patient.
e. The time constraints imposed by coexisting emergencies.
§ 768.13(b)3., Fla. Stat. (1997).
The only individual whose conduct was in question regarding section 768.13(2)(b)1., was that of Dr. Griffin, for whom JH was found to be vicariously liable. Dr. DeRespino was the only expert witness who testified as to Dr. Griffin's standard of care. Dr. DeRespino testified that Dr. Griffin's conduct evidenced reckless disregard when he failed to check for Roddenberry's vocal cords and when he failed to notice that Roddenberry's oxygen saturation levels had not increased following the intubation. An expert opinion may support a jury verdict, as long as it is grounded in fact, even though it involves a conclusion as to causation. Cromarty v. Ford Motor Co., 341 So.2d 507, 509 (Fla. 1976). However, "[a]n expert cannot simply assume the facts which form the basis of his opinion." Brito v. County of Palm Beach, 753 So.2d 109, 114 (Fla. 4th DCA 1998).
*327 Here, Dr. DeRespino did not testify that had Dr. Griffin, himself, looked for Roddenberry's vocal cords, he would have seen anything different than what Cruce had seen. Cruce testified that she could not see the vocal cords because of the burns, swelling, and Roddenberry's short mandible. Yet, according to Dr. DeRespino, Dr. Griffin knew or should have known that failing to look for the vocal cords, in and of itself, would cause harm to Roddenberry. When Cruce informed Dr. Griffin of her uncertainties as to proper placement, Dr. Griffin ordered an x-ray, noticed chest expansion, and, along with Cruce and another physician, checked for breathing sounds. These actions evidenced Dr. Griffin's concern and attempt to ensure proper placement of the intubation tube. Thus, Dr. DeRespino's opinion could not support the jury verdict as it was not grounded in facts but was instead based upon Dr. DeRespino's assumption of the facts.
Furthermore, although Dr. DeRespino testified that Dr. Griffin acted with reckless disregard when he failed to notice that Roddenberry's oxygen saturation level had not increased following intubation, the evidence in the record demonstrates that Roddenberry's oxygen saturation level remained consistent both before and after intubation. Although it would be expected that such levels would increase following proper intubation, it would also be expected that such levels would decrease if Cruce had improperly intubated. Therefore, because this opinion was contrary to the record evidence, it, too, could not support the jury verdict.
In addition, the record is devoid of any evidence to suggest that Dr. Griffin ignored the test results and monitor readings except for Dr. DeRespino's own unsupported hypothesis that Roddenberry's heart stopped beating fourteen minutes prior to any member of the medical team noticing. In developing his opinions, Dr. DeRespino ignored the certainties, including the impossibility of surviving for twenty-three minutes without oxygen and the lack of any indication that Roddenberry's oxygen saturation levels had dropped after intubation. Regardless of the faith or lack thereof that one may place in the time reports, the fact remains that one nurse using only one watch recorded the times between occurrences in the emergency room. Therefore, notwithstanding the possibility that different machines or monitors may have been set differently, Dr. DeRespino could not reasonably explain how twenty-three minutes passed between intubation and cardiac arrest. His opinion that fourteen minutes elapsed without any member of the medical team noticing that Roddenberry had arrested is based upon pure speculation.
Accordingly, we hold that the trial court erred in denying JH's motions for directed verdict and motion notwithstanding the verdict as the jury's finding that Dr. Griffin acted with reckless disregard is clearly not supported by competent, substantial evidence. The trial judge, himself, stated that, "I didn't see the evidence." We agree and, therefore, reverse and remand for entry of judgment in favor of JH. Our reversal renders JH's argument that the trial court erred in not granting its motion for new trial moot. See Moschini v. Inter-Gold Italia, Inc., 694 So.2d 774, 775 (Fla. 2d DCA 1997).

B. Causation

While we reverse and remand for entry of judgment in favor of JH based upon the insufficiency of the evidence to prove reckless disregard, we also agree with JH that appellees presented insufficient evidence at trial to prove causation. To prevail in a medical malpractice case, a plaintiff must establish the standard of *328 care owed by the defendant, the defendant's breach of the standard of care, and that such breach proximately caused the alleged damages. Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984). "In negligence actions, Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." Id. In Gooding, the supreme court quoted Prosser on this standard of proof:
[The plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.
Id. (quoting William Prosser, Law of Torts § 41 (4th ed.1971) (footnotes omitted)). The "more likely than not" standard is satisfied in a wrongful death case if a plaintiff presents evidence that establishes that the decedent had a fifty-one percent or better chance that death would not have occurred but for the actions or lack thereof of the medical care provider. Rivet v. Perez, 655 So.2d 1169, 1171 (Fla. 3d DCA 1995).
In the instant case, even if competent, substantial evidence existed in the record to support a finding that Cruce improperly intubated and that Dr. Griffin failed to remedy such, appellees failed to present competent, substantial evidence that it was more likely than not that Roddenberry would have survived but for the improper intubation. Although Dr. Briggs testified that Roddenberry had a ninety percent chance of survival at any major burn institution in this country, this testimony introduced an additional variable that was not present in Roddenberry's situation as Roddenberry had not yet been transported to such an institution. Dr. Briggs admitted that she based this statistic upon those individuals who were transported to major burn centers. Dr. Briggs also admitted that Roddenberry, having died before reaching such a center, would not be included within the statistic. Thus, Dr. Briggs' testimony presupposed Roddenberry's survivability, and was, thus, based upon pure speculation and conjecture.
Furthermore, despite Dr. Briggs' testimony that Roddenberry suffered from a survivable injury, neither Dr. Briggs, nor any other expert witness, could definitively state whether Roddenberry suffered from fatal hemolysis or from non-fatal rhabdomyolysis. While Dr. Briggs testified that Roddenberry was not suffering from "significant hemolysis," she had previously stated that she had never witnessed anyone survive the condition. At best, the probabilities in this case were evenly balanced. Because the record is devoid of any evidence that Roddenberry was actually suffering from rhabdomyolysis, the non-fatal condition, we conclude that appellees could not have established that the alleged esophageal intubation more likely than not caused Roddenberry's death. Therefore, we also hold that the trial court erred in denying JH's motions for directed verdict and motion for judgment notwithstanding the verdict as to the causation issue.

III. Bay Anesthesia

Bay argues on appeal that the reckless disregard standard of liability set forth in section 768.13(2)(b)1. is applicable to Cruce's care of Roddenberry. Legislative intent is the polestar by which a court is guided in interpreting statutes. State v. J.M., 824 So.2d 105, 109 (Fla.2002). In *329 construing a statute, the plain meaning of the statutory language is the first consideration. Jones v. State, 813 So.2d 22, 24 (Fla.2002); see also Blinn v. Fla. Dep't of Transp., 781 So.2d 1103, 1105 (Fla. 1st DCA 2000). This rule of construction requires a straightforward consideration of each relevant sentence of the statute. Blinn, 781 So.2d at 1105. If the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no need to apply the rules of statutory construction as the statute should be given its plain and obvious meaning. M.W. v. Davis, 756 So.2d 90, 101 (Fla.2000); Aetna Cas. & Sur. Co. v. Huntington Nat'l Bank, 609 So.2d 1315, 1317 (Fla.1992). We review the trial court's interpretation of a statute under the de novo standard. See Dixon v. City of Jacksonville, 774 So.2d 763, 765 (Fla. 1st DCA 2000), review dismissed, 831 So.2d 161 (Fla.2002).
Section 768.13(2)(b)1. establishes the reckless disregard standard for emergency room treatment rendered in good faith by "[a]ny hospital licensed under chapter 395, any employee of such hospital working in a clinical area within the facility and providing patient care, and any person licensed to practice medicine ..." It is a well-settled principle that when "a statute specifically enumerates those persons to be covered, ordinarily the statute will be construed as excluding from its operation all those other persons not expressly mentioned." Zopf v. Singletary, 686 So.2d 680, 681-82 (Fla. 1st DCA 1996). For instance, in Finkelstein v. North Broward Hospital District, 484 So.2d 1241, 1243 (Fla.1986), the supreme court construed the now-repealed section 768.56, Florida Statutes, which authorized attorney's fees to prevailing parties in medical malpractice actions involving "any medical or osteopathic physician, podiatrist, hospital or health maintenance organization." An unsuccessful nurse averred on appeal that the trial court lacked authority to assess attorney's fees against her because she was not one of the health care professionals enumerated in section 768.56. Id. The supreme court agreed and held that because the nurse was not a member of any of the classes of persons enumerated in section 768.56, reversal of the trial court's order as to the nurse was warranted. Id.
Here, the contract between JH and Bay clearly provides for an independent contractor relationship between the two entities. Bay, conceding that it was Cruce's employer, argues that Cruce essentially became an agent of JH by acting under the direction of Dr. Griffin and, therefore, was entitled to the protection of section 786.13(2)(b)1. However, the Legislature did not expressly include independent contractors or agents who are not licensed to practice medicine within the protection of section 768.13(2)(b)1. In contrast, in section 768.28(9)(a), which addresses the State's limited waiver of sovereign immunity for torts, the Legislature expressly included within the statute's immunity protection officers, employees, and agents. The Legislature's inclusion of the term "agent" in section 768.28(9)(a), a statute similar to section 768.13(2)(b)1., in that both serve to immunize those enumerated classes from civil liability, and its omission of the word "agent" from section 768.13(2)(b)1. demonstrate that if the Legislature had intended to include agents of hospitals or their independent contractors who are not licensed to practice medicine but who render care within their emergency rooms within the protection of section 768.13(2)(b)1., it would have done so. Cf. Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 914 (Fla.1995) (holding that when the Legislature has used a term in one section of a statute but has omitted *330 it in another section of the same statute, courts will not imply the term where it has been so excluded). Therefore, because Cruce does not come within any of the enumerated classes covered by section 768.13(2)(b)1., she is excluded from the statute's protection.
Furthermore, although the stated legislative intent behind section 768.13(2)(b)1. was to "promote the availability of emergency medical care by providing immunity from civil liability to hospitals and trauma centers and the medical emergency care providers rendering care therein to emergency care patients, ...," see Ch. 88-1 § 45(2), Laws of Fla. (emphasis added), the Legislature did not employ this "medical emergency care providers" language within the actual statute. While Cruce would undoubtedly come within the purview of the broad term "medical emergency care providers," the Legislature chose not to incorporate this more encompassing phrase within section 768.13(2)(b)1. Therefore, because legislative intent is determined primarily from the language of the statute, see State v. Rife, 789 So.2d 288, 292 (Fla.2001), and because Cruce, who was employed by Bay and who worked only as an independent contractor at JH, is not a member of any of the classes of persons enumerated in section 768.13(2)(b)1., Cruce was not entitled to the protection of the reckless disregard standard of care. See also Blinn, 781 So.2d at 1107 (holding that the Florida Supreme Court has ruled unequivocally that where the language of a statute is clear, the language must be given its effect, rather than the purpose or the intent indicated by legislative history).
Bay further argues that the application of two different standards of care within the emergency room is illogical and contrary to legislative intent. Yet, "[t]he fact that [section 768.13(2)(b)1.] fails to protect individuals seemingly worthy of protection is not for this [C]ourt to remedy, but rather the [L]egislature." Knox v. Adventist Health System/Sunbelt, Inc., 817 So.2d 961, 962 (Fla. 5th DCA 2002); see also Overstreet v. State, 629 So.2d 125, 126 (Fla.1993) (holding that if the Legislature did not intend the results mandated by a statute's plain language, the appropriate remedy is for the Legislature to amend the statute).
Because section 768.13(2)(b)1. clearly and unambiguously immunizes only hospitals licensed under chapter 395, employees of such hospitals working in a clinical area within the facility, and physicians, we are bound to follow the plain and obvious meaning of the statute. See M.W., 756 So.2d at 101; Aetna Cas. & Surety Co., 609 So.2d at 1317. Section 768.13(2)(b)1. conveys a clear and definite meaning, a meaning that precludes the application of this statute to Cruce. To interpret the statute otherwise to include Cruce merely because Dr. Griffin directed Cruce to perform an oral intubation would be to rewrite the statute, which is an endeavor not within the purview of this Court. See Knox, 817 So.2d at 963; see also State v. Jett, 626 So.2d 691, 693 (Fla. 1993) (holding that it is a settled rule of statutory construction that unambiguous language is not subject to judicial construction, however wise it may seem to alter the plain language). As such, we affirm the trial court as to this issue. In affirming, we conclude that section 768.13(2)(b)1. does not violate the Equal Protection Clause of the Florida Constitution as it bears a reasonable relationship with a permissible legislative objective of providing civil immunity to hospitals, their employees, and physicians. See Abdala v. World Omni Leasing, Inc., 583 So.2d 330, 333 (Fla.1991) (holding that the test for whether a statute violates equal protection *331 rights is whether the statute bears a reasonable relationship to a legitimate legislative objective).
Although we conclude that Cruce is not entitled to the protection of section 768.13(2)(b)1. based upon its clear and unambiguous language, we believe that this issue presents a question of great public importance. We, therefore, certify the following question:
WHETHER MEDICAL EMERGENCY CARE PROVIDERS WHO ARE NOT EMPLOYED BY HOSPITALS LICENSED UNDER CHAPTER 395 AND WHO ARE NOT LICENSED TO PRACTICE MEDICINE BUT WHO RENDER CARE WITHIN THE EMERGENCY ROOMS OR TRAUMA CENTERS OF SUCH HOSPITALS ENJOY CIVIL IMMUNITY PURSUANT TO SECTION 768.13(2)(b)1., FLORIDA STATUTES, UNLESS SUCH CARE EVINCES A RECKLESS DISREGARD FOR THE LIFE OR HEALTH OF ANOTHER.

IV. Cross-Appeal

Appellees argue on cross-appeal that in the event that we reverse as to either JH or Bay and affirm liability as to the other party, the party for whom the liability is affirmed should be held responsible for 100 percent of appellees' damages with the judgment being amended accordingly. Because we reverse the judgment as to JH and affirm liability as to Bay, we address this cross-appeal. Here, the jury found JH sixty percent at fault and Bay forty percent at fault. However, if the trial court had properly directed the verdict as to JH, the issue of apportionment between appellants would not have reached the jury. Moreover, no apportionment of fault would have been necessary as Bay would not have been permitted to list JH as a Fabre defendant on the verdict form. See Fabre v. Marin, 623 So.2d 1182, 1185 (Fla. 1993) (stating that the only means of determining a party's percentage of fault is to compare that party's percentage to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants), receded from on other grounds in Wells v. Tallahassee Mem'l Reg'l Med. Ctr., 659 So.2d 249 (Fla.1995).
In order to include a nonparty on the verdict form pursuant to Fabre, a defendant has the burden of presenting at trial that the nonparty's fault contributed to the accident or injury. See Nash v. Wells Fargo Guard Servs., Inc., 678 So.2d 1262, 1264 (Fla.1996). For instance, in Southern Bell Telephone & Telegraph Co. v. Florida Department of Transportation, the appellant, Southern Bell, argued that the trial court erred in granting the summary judgment ordered in favor of the Department of Transportation ("DOT"), a co-defendant. 668 So.2d 1039, 1040 (Fla. 3d DCA 1996), review dismissed, 671 So.2d 788 (Fla.1996). The Third District Court of Appeal rejected the appellant's Fabre argument that absent the appeal the appellant would be protected by the fact that DOT's name might still be placed on the verdict form. Id. at 1041. The court found that absent its reversal of the summary judgment, the appellant would not have been entitled to have DOT placed on the verdict form because the trial court determined as a matter of law that DOT was not at fault. Id.
Thus, here, if the trial court had properly directed the verdict as to JH, thereby determining that no fault existed on the part of JH, Bay would not have been entitled to have JH's name placed on the verdict form. Because we have decided that the trial court erred in failing to direct the verdict as to JH, as a matter of law, JH did not act with reckless disregard *332 in treating Roddenberry, nor did JH cause Roddenberry's death. As such, because the jury found Bay negligent and because the trial court erred in failing to direct the verdict as to JH, Bay is liable for 100 percent of the jury's damage award. Accordingly, we grant appellees' cross-appeal as to Bay and reverse the judgment against Bay for forty percent of appellees' damages and remand with instructions that the trial court enter judgment against Bay for 100 percent of the jury's damages award.
AFFIRMED in part; REVERSED in part; REMANDED with instructions; QUESTION CERTIFIED.
MINER, J., concurs in part and dissents in part with written opinion; WOLF, J., concurs in part and dissents in part with written opinion.
MINER, J., concurring in part and dissenting in part.
I would reverse as to all issues. I concur completely in Judge Lewis' opinion as to Jackson Hospital (JH), as well as in certifying the question and consolidating the cases for purposes of this opinion. However, I would find that, under the facts of this case, section 768.13(2)(b)1., Florida Statutes, applied to Nurse Cruce and, therefore, to Bay Anesthesia (Bay). Because I would reverse in both cases, I would not reach the issue raised in the cross-appeals. However, with the majority decision to reverse as to JH and affirm as to Bay, I do agree that the final judgment against Bay must be amended from 40% to 100% because of our finding as to causation and survivability.
While I agree with the majority that JH and Bay entered into an independent contractor relationship and that Nurse Cruce, generally speaking, was not an employee of JH, I believe that she was an employee of JH, in the sense that her activities were directed toward a particular activity or person and as that term was used in section 768.13, during the emergency treatment of William Roddenberry. Nurse Cruce was not working in an operating room where her specialized duties and those of a surgeon were not "inextricably bound." See, e.g., Fortson v. McNamara, 508 So.2d 35 (Fla. 2d DCA 1987). Instead, she was summoned to the emergency room from another part of the hospital where she was then engaged in other matters to help with the treatment of Mr. Roddenberry. Additionally, she was acting under the direct supervision of Dr. Griffin, a JH employee, according to his specific directions. She was not free to choose the method of intubation, as her preferred choice was overruled by Dr. Griffin. Nurse Cruce became the servant, so to speak, of Dr. Griffin and, therefore, JH, when Dr. Griffin "directed the procedures to be utilized by the nurse anesthetist [and] had a genuine opportunity to alter the course of events." Id. at 37. Moreover, JH did not inform Roddenberry or anyone else that Nurse Cruce was an independent contractor upon his arrival at the emergency room. See Cuker v. Hillsborough County Hospital Authority, 605 So.2d 998 (Fla. 2d DCA 1992).
Even if an "apparent agent" ordinarily is not considered an "employee," the Legislature clearly intended to protect all "medical emergency care providers" rendering care within emergency rooms and trauma centers. Nurse Cruce is not like the paramedics in Knox v. Adventist Health System/Sunbelt, Inc., 817 So.2d 961, 962 (Fla. 5th DCA 2002), who were not addressed by the Legislature despite being "seemingly worthy of protection." The paramedics were not "medical emergency care providers rendering care therein to emergency care patients." Their conduct occurred outside of the emergency room. Nurse *333 Cruce, on the other hand, was part of an emergency room team acting at the direction of Dr. Griffin within the emergency room.
The Legislature clearly intended to protect Nurse Cruce, and failing to construe the term "employee" broadly enough to include her leads to incongruous results, as this case makes so readily apparent. Below, the jury was asked to scrutinize the conduct of two people who worked on Roddenberry, Nurse Cruce and Dr. Griffin. Then, despite the fact that Nurse Cruce was acting according to Dr. Griffin's orders and that he was "captain of the ship," so to speak, overseeing all of the treatment, the jury was asked to determine whether Nurse Cruce acted negligently and whether Dr. Griffin acted with "reckless disregard." This makes no sense to me. It seems irrational to maintain that the Legislature intended to apply two different standards to people working as part of one trauma team, at the same time, in the same location, and on the same patient. It is even more unsound, in my view, to suggest that sec. 768.13(2)(b)1. was intended to provide greater protection to the person in charge of the team than to one of the team members acting under the leader's direct orders. I simply can find no rational basis for providing greater protection to Dr. Griffin than to one of the people acting at his direction simply because the name of the entity atop her paycheck was Bay Anesthesia instead of Jackson Hospital. Accordingly, I would reverse and remand for a new trial, during which Appellees would have to establish that Nurse Cruce acted with "reckless disregard" in order to prevail.
WOLF, J., concurring in part and dissenting in part.
I would affirm as to all issues. While I believe the issue of survivability is a close one, the evidence taken in the light most favorable to the plaintiff supports the verdict. The evidence as to reckless disregard is also sufficient to support the jury's verdict. Also, I agree with the remand for entry of a judgment against Bay for 100 percent of the jury's damages award in light of the majority's determination that Jackson County Hospital's conduct was not the legal cause of the death in this case.
Reckless disregard as defined in the statute means "conduct which a health care provider knew or should have known, at the time such services were rendered, would be likely to result in injury so as to affect the life or health of another ...." § 768.13(2)(b)3., Fla. Stat. (1997).
The question of whether a health care provider acted with reckless disregard as defined by section 768.13(2)(b)3. and whether such recklessness was a legal cause of the patient's death present jury questions which generally should not be resolved by directed verdict. See Garcia v. Randle-Eastern Ambulance Serv., Inc., 710 So.2d 74 (Fla. 3d DCA 1998). "A party moving for a directed verdict admits not only the facts stated in the evidence presented but [a party] also admits every conclusion favorable to the adverse party that a jury might reasonably infer from the evidence." Id. at 75 (citations omitted).
All the health care providers, including Dr. Griffin, admitted that improper intubation would result in the patient's death. All the witnesses admitted there was some indication that there might be a problem with the initial intubation. The respiratory therapist testified that the CO2 detector showed no color change which indicated improper intubation. She also testified that she told Dr. Griffin that she wasn't sure if the tube was in place! While it is undisputed that Dr. Griffin took several steps to determine whether the tube was *334 inserted correctly, there was also evidence there were other steps which could be taken to verify the tube's placement. Dr. Griffin failed to take these steps. Dr. DeRespino, the plaintiff's expert, testified that failure to take these steps constituted reckless disregard. In Garcia, the court indicated that failure to take action in light of a problem that would likely result in death could constitute reckless disregard. Id. at 76. Such is the case here.
As to the survivability or causation issue, the majority's concern seems to be threefold: 1) inconsistencies, especially as to timing, which call into question whether death was caused by improper intubation; 2) the competence of Dr. Briggs' testimony (plaintiff's expert as to causation) in light of evidence of hemolysis; and 3) the competence of Dr. Briggs' testimony in light of the fact that the victim was not being treated in a major burn unit. While these issues make me question whether I would have returned a verdict for the plaintiff, I am not a juror. Reasonable inferences regarding the testimony of the medical examiner and Dr. Briggs support the verdict.
Marie Hermann, the Chief Medical Examiner for the Fourteenth Circuit, testified that the cause of death was low oxygen from esophageal intubation and the morphine tipped the deceased over the edge. Dr. Hermann testified that the patient, Mr. Roddenberry, did not die directly from the burn injuries.[1] She further testified as to factual findings which were consistent with the opinion, including the doctor's opinion that the inhalation injury from the accident was mild.
Plaintiff's burn expert, Susan Miller Briggs, M.D., testified that Roddenberry had a "very survivable burn." She explained that had Mr. Roddenberry made it to a burn unit and survived to leave the burn unit, his life expectancy would have been very good:
I think he would have had, based on the fact that he had a mild inhalation injury, did not appear to have a severe inhalation injury, was an 18 year old and had 85 percent burns of which at the time they said 20 percent were full thickness, but I think they would have been deeper, he would have had a better than 90 percent survival chance in any major burn unit in this country.
. . . .
I think his life expectancy would have been the same as any other person who is his age. I think certainly burns leave you with many physical handicaps, but they do not change your life expectancy, just like any other handicapped person.
(Emphasis added.)
The majority states that Dr. Briggs' testimony must be disregarded because the evidence of a port wine color of the urine demonstrates that Mr. Roddenberry had hemolysis, a condition that indicates a burn patient faces imminent death. Dr. Briggs had reviewed the records, however, and explained in response to questioning, "Mr. Roddenberry did not have hemolysis. His hematocrit was 55. He had red urine." When asked whether the hematocrit that was measured in the emergency department at Jackson Hospital ruled out the hemolysis, Dr. Briggs responded, "It doesn't rule out any hemolysis because we don't know if that was a hemoglobin or myoglobin, but it certainly rules out any significant hemolysis."
The majority states that Dr. Briggs' testimony must be rejected because she did not explain the difference between significant *335 and non-significant hemolysis. It obviously would have been clearer if the next question had been asked: whether a person could survive with the non-significant level of hemolysis. Even without this question being asked, the jury clearly could reasonably infer that Dr. Briggs was aware of the hematocrit level and still felt that there was a greater than 50 percent chance of survival with proper treatment.
The other reason the majority gives for determining that Dr. Briggs' testimony must be rejected as a matter of law is that her opinion as to survivability was directed to only those patients who were being treated in major burn units. The majority's reasoning on the issue is incorrect for two reasons: First, Dr. Griffin testified it was his intent to stabilize the patient and transfer him to the burn unit at University of South Alabama in Mobile; second, on redirect Dr. Briggs clarified that her opinion as to survivability was based on review of the records of this particular case. I, therefore, believe the standards of causation adopted by University Hospital Bldg., Inc. v. Gooding, 419 So.2d 1111 (Fla. 1st DCA 1982), have been met.
As to the issue on cross-appeal, I agree with Judge Lewis that, based upon the results reached within his opinion, the proper remedy is to remand for a judgment against Bay holding them responsible for 100 percent of the damages.
Because of the majority's determination that causation was not proven, Jackson Hospital's negligence cannot be a contributing cause of the death of Mr. Roddenberry.[2] Therefore, pursuant to Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262 (Fla.1996), Jackson Hospital cannot be placed on the verdict form or determined to be responsible for the death.
NOTES
[1] We note that Bay, unlike JH, did not argue on appeal that the evidence presented by appellees at trial was legally insufficient to prove its negligence.
[1] Any testimony concerning time discrepancies may be argued to be inconsistent with the medical examiner's opinion but does not serve to negate it.
[2] This issue was not raised by Bay as part of their appeal.