# Supreme Court of Florida

_____

No. SC16-1587
_____

**THE NATIONAL DEAF ACADEMY, LLC, etc.,**
Petitioner,

vs.

**DENISE TOWNES, etc., et al.,**
Respondents.

[April 26, 2018]

PARIENTE, J.

The issue in this case requires this Court to determine when a negligence claim arises out of the "rendering of, or the failure to render, medical care or services," as the Legislature's definition of medical malpractice provides, thereby subjecting a plaintiff to the onerous presuit requirements and restrictions of the medical malpractice statutory scheme. § 766.106(1)(a), Fla. Stat. (2008).[1] In the decision under review, the Fifth District Court of Appeal held that a claim arising out of the alleged negligence by employees of the National Deaf Academy in

_____

1. While the 2008 version of the Florida Statutes applies to this case, the current version of the Florida Statutes is materially the same.

attempting to physically restrain one of its residents, which resulted in injury to the resident, sounded in ordinary negligence. *Townes v. Nat'l Deaf Academy, LLC*, 197 So. 3d 1130, 1135 (Fla. 5th DCA 2016). Reasoning that the employees' actions were "not for treatment or diagnosis of any condition," were not intended "to meet [the resident's] daily needs during care, and did not require medical skill or judgment," the Fifth District reversed the trial court's entry of summary judgment for failure to timely comply with the medical malpractice presuit requirements. *Id.* at 1136.

The National Deaf Academy argues, and we agree, that the Fifth District's decision conflicts with the First District Court of Appeal's decision in *Shands Teaching Hospital & Clinics, Inc. v. Estate of Lawson*, 175 So. 3d 327 (Fla. 1st DCA 2015), holding that a claim arising out of a psychiatric hospital employee leaving her keys and badge unattended, which resulted in a patient's death, sounded in medical malpractice. *Id.* at 328.[2] We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

In accordance with the Legislature's definition of medical malpractice and this Court's relevant case law, we hold that for a claim to sound in medical

_____

2. In *Shands*, the patient's estate petitioned this Court for review based on conflict. However, before we made a determination on jurisdiction, the parties resolved the case and we approved the dismissal. *See Estate of Lawson v. Shands Teaching Hosp. & Clinics, Inc.*, No. SC15-1827, 2016 WL 7007923 (Fla. Nov. 30, 2016).

malpractice, the act from which the claim arises must be directly related to medical care or services, which require the use of professional judgment or skill. Because we conclude that neither the claim in *Townes* nor the claim in *Shands* arose from an act directly related to medical care or services, which require the use of professional judgment or skill, we approve the Fifth District's decision in *Townes* and disapprove of the First District's decision in *Shands*.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an action for damages brought by Denise Townes, on behalf of Cinnette Perry,[3] and Cinnette Perry, individually, against the National Deaf Academy, by and through its employees, for injuries Perry sustained while she was a resident at the National Deaf Academy. As explained by the Fifth District:

> [The National Deaf Academy] operates as both a school and a residential treatment facility, licensed pursuant to Chapter 394, Florida Statutes (2008), for deaf, hard of hearing, and autistic individuals suffering from psychiatric and behavioral disorders. [The National Deaf Academy] offers psychiatric, psychological, medical, speech therapy, and educational services to its residents. [The National Deaf Academy's] staff includes psychiatrists, nurses, teachers, therapists, and sign language interpreters.
> Before going to [the National Deaf Academy], Perry was diagnosed with bipolar disorder-mixed, intermittent explosive disorder, impulse control disorder not otherwise specified, conduct disorder, and post-traumatic stress disorder. During her admission, a [National Deaf Academy] psychiatrist established a plan of care for

---

3. Townes is Perry's adult aunt.

Perry that included Therapeutic Aggression Control Techniques ("TACT"), which involves staff members physically restraining the resident. Prior to employing a TACT hold, the most senior employee on scene is required to make a determination as to whether the TACT hold is an appropriate method to control the resident.

*Townes*, 197 So. 3d at 1133.

The Fifth District set forth the circumstances that led to Perry's injuries as follows:

> On August 7, 2008, Danielle Warren, a nurse employed by [the National Deaf Academy], received notice that Ms. Perry "eloped off campus." When Perry voluntarily returned to [the National Deaf Academy's] campus, she began throwing rocks at [the National Deaf Academy] staff and its buildings, causing several windows to shatter. Perry also pulled on cables, wires, and lightning rods, trying to dislodge them.
> After the staff removed the other residents from the area, four [National Deaf Academy] staff members attempted to verbally de-escalate the situation. Since Perry was not responding to the verbal de-escalation attempts, Nurse Warren made the decision to perform a TACT protective hold. After Nurse Warren called Dr. Karen Goldberg, [the National Deaf Academy's] Associate Medical Director, the staff attempted to employ a TACT hold. The attempt was unsuccessful as Perry was agitated. According to Nurse Warren, Perry positioned her toe down into where "the dirt meets the concrete" and then wrapped her leg around Nurse John Barclay, causing both to fall. As she fell, Perry sustained an injury to her leg, which the staff believed to be a dislocated knee.

*Id.* "[A]s a result of the injury sustained during the attempted TACT protective hold, Perry underwent an above-the-knee amputation of her left leg." *Id.*

Townes filed a two-count complaint, alleging claims of ordinary negligence against the National Deaf Academy, by and through its employees. *Id.* at 1133-34.

- 4 -

The National Deaf Academy moved to dismiss the complaint, arguing that Townes's claims sounded in medical malpractice and Townes failed to timely comply with the presuit notice requirements for medical malpractice claims under chapter 766, Florida Statutes (2008), before the expiration of the two-year statute of limitations. *Townes*, 197 So. 3d at 1134.[4] The trial court permitted Townes to conduct limited discovery on whether the TACT hold was administered by nonmedical as well as medical staff members of the National Deaf Academy. *Townes*, 197 So. 3d at 1134.

Two registered nurses involved in the incident testified in deposition that a TACT hold is "a form or a style of physical intervention for the mentally ill." They explained that a TACT hold is administered "[t]o protect the resident from himself or herself, as well as protect the other residents from [the resident] if [the resident is] violent." The nurses testified that the purpose of a TACT hold is "[f]or

---

4. It is undisputed that the National Deaf Academy is *not* a health care provider, as defined in section 766.202(4), Florida Statutes (2008). However, the National Deaf Academy employs health care providers, such as psychiatrists and nurses. *See Townes*, 197 So. 3d at 1133. "[U]nder the doctrine of respondeat superior, an employer of a health care provider also may be a 'prospective defendant' in a medical negligence action, even if the employer does not fall within the statutory definition of health care provider." *Weinstock v. Groth*, 629 So. 2d 835, 838 (Fla. 1993). Thus, an employer "may be vicariously liable under the professional medical negligence standard of care set forth in section 766.102(1) when its agent or employee, who is a health care provider, negligently renders medical care or services." *Id.*

safety of the resident and for safety of the other residents. For safety in general."

While the inclusion of a TACT hold in a resident's plan of care is a decision made

by a medical doctor, the nurses explained that the decision to administer a TACT

hold need not be made by a medical doctor. Rather, a nurse, supervisor, or "the

most senior person that is train[ed] and qualified in TACT," has the authority to

decide that a TACT hold is necessary. Moreover, everyone employed by the

National Deaf Academy, including mental health technicians and sign language

interpreters, completes TACT training.

After the limited discovery period and the National Deaf Academy's

renewed motion to dismiss, Townes amended her complaint. *Townes*, 197 So. 3d

at 1134. Consistent with the original complaint, Counts I and II alleged claims of

ordinary negligence against the National Deaf Academy, by and through its

employees. *Id.*[5]

---

5. Townes's amended complaint also added four new counts. *Townes*, 197 So. 3d at 1134. Counts III and IV alleged "alternative" claims of medical malpractice. The trial court also entered summary judgment on these counts because they were untimely, which the Fifth District affirmed. *Id.* That ruling is not at issue in this appeal.

Counts V and VI of the amended complaint alleged violations of chapter 394, Florida Statutes (2008) ("The Florida Mental Health Act" or "The Baker Act"). *Townes*, 197 So. 3d at 1134. As an additional argument, the National Deaf Academy contends that the Fifth District erred in holding that Counts V and VI in the amended complaint relate back to the original complaint. We exercise our discretion and decline to address this issue that is outside the scope of our conflict jurisdiction. *See* Fla. R. App. P. 9.030(a)(1)(A)(iv); *Marsh v. Valyou*, 977 So. 2d 543, 545 n.1 (Fla. 2007) (declining to address issue beyond the scope of the

The National Deaf Academy moved for final summary judgment, arguing that Counts I and II alleged medical malpractice claims and were time-barred because the two-year statute of limitations for medical malpractice claims had expired prior to the filing of the original complaint. *See Townes*, 197 So. 3d at 1134. The trial court agreed, reasoning that although Counts I and II were "styled as [ordinary] negligence claims," they "actually ar[o]se out of the rendering of medical care and services," and, therefore, alleged medical malpractice claims. Accordingly, the trial court granted the National Deaf Academy's motion for summary judgment.

Townes appealed and, upon review, the Fifth District reversed, concluding that Townes's claims alleged ordinary negligence. *Id.* at 1130. The Fifth District noted the nurses' deposition testimony that "the purpose of a TACT protective hold is to ensure the safety of the residents, and that non-medical personnel, such as sign language interpreters, also underwent TACT training." *Id.* at 1136. The Fifth District further reasoned that "[t]here was additional record evidence that the decision of whether to employ a TACT protective hold is to be made by the most senior person trained in TACT; however, that person does not necessarily have to be a medical professional." *Id.* Thus, the Fifth District concluded:

Court's conflict jurisdiction); *Paulucci v. Gen. Dynamics Corp.*, 842 So. 2d 797, 803 n.6 (Fla. 2003) (declining to address issues beyond the scope of the certified question).

> We find that on the record before this court, the use of the TACT protective hold on Perry was *not for treatment or diagnosis of any condition, was not employed to meet Perry's daily needs during care, and did not require medical skill or judgment as non-medical staff were taught the procedure and were authorized to decide whether to employ it.* We find that Counts I and II assert claims sounding in ordinary negligence, rather than medical malpractice. Accordingly, we reverse the summary judgment entered on Counts I and II.

*Id.* (emphasis added).

## ANALYSIS

The issue in this case requires this Court to determine when a negligence claim arises out of the "rendering of, or the failure to render, medical care or services," as the Legislature's definition of medical malpractice provides, thereby subjecting a plaintiff to the restrictions and requirements of the medical malpractice statutory scheme, as well as a shorter statute of limitations than for ordinary negligence claims. § 766.106(1)(a), Fla. Stat. (2008). The specific facts of this case involve the alleged negligent administration of a method of physical restraint, which is performed for the safety of both the resident and others, and can be performed by nonmedical personnel. *See Townes*, 197 So. 3d at 1133. The determination of whether a complaint alleges a claim for medical malpractice is a legal one and is, therefore, reviewed de novo. *See Dockswell v. Bethesda Mem'l Hosp., Inc.*, 210 So. 3d 1201, 1206 (Fla. 2017); *Pierrot v. Osceola Mental Health, Inc.*, 106 So. 3d 491, 492 (Fla. 5th DCA 2013).

Whether a claim arises from ordinary negligence or medical malpractice has significant implications. For example, as shown by the facts of this case, medical malpractice claims have a shorter statute of limitations than ordinary negligence claims—two years versus four years, respectively. *See* § 95.11(3)(a), (4)(b), Fla. Stat. (2008). Prospective medical malpractice plaintiffs must also comply with complex presuit requirements, as set forth in chapter 766, Florida Statutes, before filing a medical malpractice suit, which includes conducting "an investigation to ascertain that there are reasonable grounds to believe" that medical malpractice occurred. *Id.* § 766.203(2); *see generally id.* § 766.201-.212. The restrictions that chapter 766 places on medical malpractice plaintiffs' ability to prove their cases persist even after a lawsuit is filed, such as providing specific qualifications for medical experts testifying as to the standard of care. *See generally id.* § 766.102. Just last year, we concluded that through chapter 766, the Legislature "has restricted plaintiffs' ability to bring medical malpractice claims." *Dockswell*, 210 So. 3d at 1205.

Because of the statutory restrictions and requirements that apply only to medical malpractice claims, any "doubt" as to whether a claim is for ordinary negligence or medical malpractice should be "generally resolved in favor of the claimant." *J.B. v. Sacred Heart Hosp. of Pensacola*, 635 So. 2d 945, 947 (Fla. 1994).

To resolve the issue in this case, we begin with the statutory definition of medical malpractice, enacted by the Legislature and interpreted by this Court and the district courts of appeal. We then examine how that statutory definition has been applied by courts tasked with determining whether a claim sounds in ordinary negligence or medical malpractice. Finally, we turn to address the conflict and facts presented in this case.

## I. Medical Malpractice

The Legislature has defined a claim for medical negligence or medical malpractice as "a claim, arising out of the rendering of, or the failure to render, medical care or services." § 766.106(1)(a), Fla. Stat. (2008). The Legislature has further provided that proving a medical malpractice claim requires establishing that the allegedly negligent act "represented a breach of the prevailing professional standard of care," as testified to by a qualified medical expert. *Id.* § 766.102(1); *see id.* § 766.102(5).

In *Silva v. Southwest Florida Blood Bank, Inc.*, 601 So. 2d 1184 (Fla. 1992), we explained that the inquiry for determining whether a claim sounds in medical malpractice "is twofold: (1) whether the action arose out of 'medical . . . diagnosis, treatment, or care,' and (2) whether such diagnosis, treatment, or care was rendered by a 'provider of health care.' " *Id.* at 1186 (alteration in original). Additionally, we determined that the words "diagnosis," "treatment," and "care" should be

- 10 -

"accorded their plain and unambiguous meaning," explaining that, "[i]n ordinary, common parlance, the average person would understand 'diagnosis, treatment, or care' to mean ascertaining a patient's medical condition through examination and testing, prescribing and administering a course of action to effect a cure, and meeting the patient's daily needs during the illness." *Id.* at 1187. Moreover, "in order to determine whether the presuit requirements of chapter 766 apply, we look to whether the plaintiff must rely upon the medical negligence standard of care as set forth in section 766.102(1)." *Integrated Health Care Servs., Inc. v. Lang-Redway*, 840 So. 2d 974, 980 (Fla. 2002).

At issue in *Silva* was whether blood banks were subject to the two-year statute of limitations applicable to medical malpractice actions. 601 So. 2d at 1186. We concluded that blood banks were not subject to the shortened statute of limitations because the allegations against the blood bank—including negligence and breach of its warranty regarding the representation that its blood was safe—did not arise "out of any medical, dental, or surgical diagnosis, treatment, or care." *Id.* at 1189; *accord id.* at 1187. We also rejected the blood bank's assertion that it was a health care provider, as defined by the Legislature, explaining:

> We can find no indication that the legislature intended for blood banks to be considered "providers of health care" for purposes of the medical malpractice statute of limitations. Nor do we find it permissible generally to construe that term broadly. *In the absence of clear legislative intent to the contrary, we are not at liberty to construe that term so as to deprive plaintiffs of their causes of action.*

*Id.* at 1189 (emphasis added).

Consistent with our case law, the district courts have constructed additional principles for determining whether a claim sounds in ordinary negligence or medical malpractice. For example, the Fifth District has explained that the wrongful act from which the claim arises "must be directly related to the improper application of medical services and the use of professional judgment or skill." *Joseph v. Univ. Behavioral LLC*, 71 So. 3d 913, 917 (Fla. 5th DCA 2011). Stated another way, "[t]he injury must be a direct result of receiving medical care or treatment by the healthcare provider." *Quintanilla v. Coral Gables Hosp., Inc.*, 941 So. 2d 468, 469 (Fla. 3d DCA 2006).

In *Joseph*, relied on by the Fifth District in *Townes*, a psychiatric patient sued the psychiatric hospital for negligence after he was punched in the face by another patient. 71 So. 3d at 915. This incident occurred after a previous altercation between the two patients, which led the patient who was ultimately injured to ask the hospital to separate him from the other patient. *Id.* The hospital did not. *Id.* The hospital argued that the decision to not separate the two patients "was a 'medical' decision" and that it "accordingly falls within the category of medical care and treatment for which compliance with the medical malpractice statute and statute of limitations were required." *Id.* at 919. The Fifth District properly rejected that argument, reasoning that nothing in the patients' deposition

"suggest[ed] that any psychiatric treatment decisions resulted in his exposure to the injury he suffered." *Id.* at 919-20.

An additional principle discussed by the Fifth District in *Joseph* and other district courts of appeal is that merely because "a wrongful act occurs in a medical setting does not necessarily mean that it involves medical malpractice." *Id.* at 917; *see Holmes Reg'l Med. Ctr., Inc. v. Dumigan*, 151 So. 3d 1282, 1286 (Fla. 5th DCA 2014) ("It is axiomatic that the mere fact that a wrongful act occurs in a medical setting does not automatically transform the contested action into one that sounds in medical malpractice . . . ."); *Lynn v. Mount Sinai Med. Ctr., Inc.*, 692 So. 2d 1002, 1003 (Fla. 3d DCA 1997) ("Merely because a wrongful act occurs in a medical setting does not necessarily mean that it involves medical malpractice."). This principle was highlighted in *Quintanilla*, where a patient, who was admitted to the hospital "complaining of a cough, shortness of breath, bronchitis and nasal congestion," brought a negligence action against the hospital after a nurse spilled scalding hot tea on him. 941 So. 2d at 469. In support of its motion to dismiss the patient's complaint for failure to comply with the chapter 766 presuit requirements, the hospital filed the affidavit of a nurse practitioner who attested that "hot tea was a treatment modality for the cough associated with respiratory distress, and that the serving of food, fluids and other dietary and nutritional items, including hot tea, is part and parcel of medical care provided by the hospital staff to patients." *Id.*

On appeal, the Third District Court of Appeal rejected the hospital's contention that "because the nurse used her medical judgment" in giving the patient hot tea, "the actual act of serving the hot tea amounts to a medical service," determining that this was "simply a claim that arises out of the act of serving a cup of hot tea." *Id.* at 470. In a common sense approach, the Third District cogently explained:

> The process of serving tea did not involve medical skill or judgment. The injury is not a direct result of receiving medical care from the provider. Even though, arguably, the nurse may have used her medical judgment to agree with [the patient's] request for hot tea to help his condition, the process of serving the hot tea did not require medical skill or judgment. Not only was [the patient] not injured as a direct result of receiving medical care or treatment by the hospital employee, but in order to bring forth a claim of negligence, [the patient] would not have had to show that a hospital employee breached a prevailing professional standard of care which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar healthcare providers, and that such a breach was the cause of his injuries. There does not appear to be a medical standard of care for serving hot tea. Therefore, [the patient] was not required to comply with the medical malpractice pre-suit requirements.

*Id.* (citations omitted).

For these same reasons, the Fourth District Court of Appeal properly held that a claim arising out of an injury sustained by a dialysis patient when a hospital employee inadvertently kicked the patient's foot in an attempt to return the footrest of the patient's chair to the upright position sounded in ordinary negligence. *Tenet St. Mary's Inc. v. Serratore*, 869 So. 2d 729, 730 (Fla. 4th DCA 2004). The Fourth

- 14 -

District explained that the claim did not "arise out of the receiving of medical care," nor did it require that the patient prove that the hospital employee's actions "deviated from an accepted standard of medical care" because "[t]here is clearly no professional standard of care involved in attempting to kick a footrest of the reclining chair to return it to its upright position." *Id.* at 731.

On the other hand, where a claim arose from injuries sustained while a patient was connected to physical therapy equipment, the Second District Court of Appeal properly concluded that the claim sounded in medical malpractice, since the injuries were "directly inflicted by the medical care—that is, physical therapy treatment" provided by the health care provider. *Corbo v. Garcia*, 949 So. 2d 366, 369 (Fla. 2d DCA 2007). The Second District reasoned that "[t]he medical negligence standard of care—that the alleged actions of the health care provider presented a breach of the prevailing professional standard of care—must be proved in this case in order for [the patient] to obtain relief." *Id.* at 370.

In *Goldman v. Halifax Medical Center, Inc.*, 662 So. 2d 367 (Fla. 5th DCA 1995), a similar case, relied on by the Second District in *Corbo*, the Fifth District held that a claim arising out of the application of excessive pressure while using mammographic equipment, which caused one of the plaintiff's breast implants to rupture, sounded in medical malpractice. *Id.* at 368. The Fifth District characterized the claim as "not unlike a claim that one was injured when a doctor

used an unclean scalpel, a claim which would clearly fall within the realm of providing medical care." *Id.* at 370.

Our holding today flows naturally from these cases that faithfully construe the Legislature's definitions in chapter 766 and this Court's precedent. Accordingly, we hold that for a claim to sound in medical malpractice, the act from which the claim arises must be directly related to medical care or services, which require the use of professional judgment or skill. This inquiry involves determining whether proving the claim requires the plaintiff to establish that the allegedly negligent act "represented a breach of the prevailing professional standard of care," as testified to by a qualified medical expert. Our holding will allow ordinary negligence cases to proceed without requiring the plaintiff to obtain a presuit corroborating expert and follow the additional matrix of presuit procedures, while still advancing the Legislature's policy goals of encouraging the early settlement of meritorious and screening out frivolous medical malpractice claims. *See Kukral v. Mekras*, 679 So. 2d 278, 284 (Fla. 1996).

We now turn to address the conflict in this case.

## II. The Conflict

The National Deaf Academy argues that the Fifth District's decision in *Townes*, concluding that Townes's claim arising out of the TACT hold that led to Perry's injuries sounds in ordinary negligence, conflicts with *Shands*, where the

First District held that a claim arising out of a psychiatric hospital employee leaving her badge and keys where a patient could access them, which led to that patient's death, sounded in medical malpractice.[6] The National Deaf Academy asserts that, had the Fifth District followed the First District's reasoning in *Shands*, it would have properly determined that Townes's complaint set forth a claim for medical malpractice. For the reasons that follow, we conclude that the First District applied an overly broad and attenuated standard for determining whether a claim sounds in medical malpractice.

In *Shands*, a patient was admitted to the locked unit at a psychiatric hospital. 175 So. 3d at 328. After taking an employee's unattended badge and keys, the

---

6. The National Deaf Academy also asserts conflict with *South Miami Hospital, Inc. v. Perez*, 38 So. 3d 809 (Fla. 3d DCA 2010), and *Indian River Memorial Hospital, Inc. v. Browne*, 44 So. 3d 237 (Fla. 4th DCA 2010). The complaint in *Perez* alleged that the patient fell from his hospital bed "while left unrestrained and unattended" in the critical care unit and the hospital failed to properly monitor/supervise the patient. *Perez*, 38 So. 3d at 811. Likewise, in *Browne*, the complaint alleged that the hospital "failed to follow hospital rules, policies, or procedures intended to protect patients from falling," failed to engage or properly secure the stretcher's side guardrails, and failed to adequately supervise the patient, given his disoriented and confused state upon arrival to the emergency room. *Browne*, 44 So. 3d at 238. *Perez* and *Browne* fall into a gray area. Whether the kinds of claims presented in those cases sound in ordinary or medical negligence depends on both the specific circumstances under which the injury occurred and the allegations in the pleadings. Because we conclude that the facts of those cases are sufficiently distinguishable from this case and *Shands*, we neither approve nor disapprove them. However, we reiterate that the fact an injury occurs in a hospital does not automatically transform the claim into one for medical malpractice.

- 17 -

patient escaped from the hospital, eventually making her way onto a nearby highway where she was hit by a truck and killed. *Id.* at 329. The patient's estate sued the hospital, alleging that the hospital breached its "legal duty to confine [the patient] within the locked unit, where she had been admitted because her psychiatric condition demanded the safety and security of a 'locked unit.' " *Id.* at 331.

The First District framed the estate's claim as the failure to keep the patient "adequately confined within the locked unit as her condition required." *Id.* at 334. Framing the claim this way, the First District determined that "the proof required in this case will inevitably involve the medical negligence standard of care." *Id.* at 332. The First District reasoned that "[w]ithout the help of experts to establish what is acceptable, appropriate, and prudent in this psychiatric context, jurors cannot be expected to determine through common experience whether [the hospital] or its employee breached relevant standards." *Id.* at 333. Thus, because the hospital failed to confine the patient to the hospital, "which was the very service that the locked unit existed to provide" and the service that the patient's condition required, the First District held that the estate's claim sounded in medical malpractice. *Id.* at 331.

We disagree with the First District's analysis in *Shands*. While it is true that the hospital failed to confine the patient to her locked unit, the estate's claim arose

out of the hospital employee leaving her badge and keys unattended where the patient could access them, not out of any act directly related to medical care or services that required the use of professional judgment or skill. Thus, contrary to the First District's conclusion, medical expert testimony on the professional standard of care would not be necessary for the estate to prove its negligence claim. *Id.* at 332-33.

Construing what constitutes medical malpractice as broadly as the First District did in *Shands* would render essentially any claim arising out of a negligent act by a health care provider subject to the onerous presuit requirements in chapter 766 and the shortened statute of limitations for medical malpractice claims. As Judge Wolf observed dissenting in *Shands*, such a broad construction is inconsistent with the Legislature's clear purpose for instituting the presuit procedures:

> The clear import of these extensive procedures [set forth in chapter 766] is to prevent frivolous second guessing of health care providers in their diagnosis of patients and their method of treatment of patients. The onerous procedures were not intended to provide unnecessary obstacles to injured parties attempting to institute claims against health care providers for simple carelessness. Indeed, requirements of extensive investigation and written medical expert opinions would make no sense in the context of simple careless acts, such as carelessly leaving one's keys where a patient can get them.

*Id.* at 343 (Wolf, J., dissenting).

Further, the Legislature chose to define medical malpractice as a claim arising out of the rendering of, or failure to render, "medical care or services." § 766.106(1)(a), Fla. Stat. (2008). The Legislature also made clear that proving a medical malpractice claim requires the testimony of a qualified medical expert that the alleged negligent act breached the prevailing professional standard of care. *See id.* § 766.102(1), (5).[7] As we stated in *Silva*, "[i]n the absence of clear legislative intent to the contrary, we are not at liberty to construe" terms defined in chapter 766 "so as to deprive plaintiffs of their causes of action." 601 So. 2d at 1189. Accordingly, only claims that arise out of an action or inaction directly related to medical care or services, which require the use of professional judgment or skill, sound in medical malpractice. We now turn to this case.

### III. This Case

---

7. This requirement does not apply to cases where a foreign body is discovered, because such a discovery "shall be prima facie evidence of negligence on the part of the health care provider." § 766.102(3)(b), Fla. Stat. (2017); *see Dockswell*, 210 So. 3d at 1205-06 ("The foreign-body presumption of negligence . . . has survived throughout the legislative amendments restricting the ability of medical malpractice plaintiffs to bring claims.").

- 20 -

The National Deaf Academy argues that Townes's claim sounds in medical malpractice because the decision to include the use of TACT holds in Perry's plan of care was made by a medical doctor and medical expert testimony on the prevailing professional standard of care will be necessary to prove Townes's claim. We disagree.

Although it is undisputed that the decision to include the use of TACT holds in Perry's plan of care was made by a medical doctor, "the purpose of a TACT protective hold is to ensure the safety of the residents." *Townes*, 197 So. 3d at 1136. Additionally, TACT training was not solely reserved for the National Deaf Academy's medical staff, as "non-medical personnel, such as sign language interpreters, also underwent TACT training." *Id.* Thus, the fact that a medical doctor made the decision to include TACT holds in Perry's care plan does not automatically transform the claim into one for medical malpractice because, as the Fifth District reasoned, administration of the TACT hold "did not require medical skill or judgment as non-medical staff were taught the procedure and were authorized to decide whether to employ it." *Id.*

Moreover, as one of the National Deaf Academy's nurses testified in deposition, a TACT hold is administered "to control an out-of-control resident" and "[t]o protect the resident from himself or herself, as well as protect the other residents from them if they are violent." Indeed, the TACT hold was only

- 21 -

administered after Perry "eloped off campus," "began throwing rocks at [National Deaf Academy] staff and its buildings" upon her return, and "pulled on cables, wires, and lightning rods" in an attempt to dislodge them. *Id.* at 1133. Therefore, it cannot be said that when the National Deaf Academy staff administered the TACT hold on Perry in an attempt to stop her from throwing rocks at staff and pulling on lightning rods, they were "ascertaining [Perry's] medical condition through examination and testing, prescribing and administering a course of action to effect a cure, [or] meeting [Perry's] daily needs." *Silva*, 601 So. 2d at 1187.

The gravamen of Townes's claim is that the National Deaf Academy, by and through its employees, negligently administered the TACT hold that led to Perry's injuries. Proving that claim will not require testimony from a medical expert on the professional standard of care. Therefore, because Townes's claim does not arise out of an act that is directly related to medical care or services, which require the use of professional judgment or skill, the Fifth District properly concluded that her claim does not allege medical malpractice, but ordinary negligence.

**CONCLUSION**

Limiting medical malpractice claims to those that are directly related to medical care or services, which require the use of professional judgment or skill, ensures that plaintiffs bringing claims of ordinary negligence are not subjected to the complex presuit procedures for medical malpractice claims, while still

advancing the Legislature's policy goals of encouraging early settlement and screening out frivolous medical malpractice claims. In this case, because the administration of a TACT hold was not directly related to medical care or services, which require the use of professional judgment or skill, Townes's claim does not arise from medical malpractice, and her lawsuit is not barred by the two-year statute of limitations or her failure to comply with the presuit requirements set forth in chapter 766. For the same reasons, a claim arising out of a hospital employee leaving her keys and badge where a patient can access them does not sound in medical malpractice. *Shands*, 175 So. 3d 327. Accordingly, we approve the Fifth District's decision in *Townes*, and disapprove of the First District's decision in *Shands*.

It is so ordered.

LABARGA, C.J., and QUINCE, CANADY, and POLSTON, JJ., concur.
LEWIS, J., concurs in result.
LAWSON, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Fifth District - Case No. 5D14-904

(Lake County)

Mark Hicks and Mary Street of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida; and Julie W. Allison of Julie W. Allison, P.A., Miami, Florida,

for Petitioner

Nicholas A. Shannin of Shannin Law Firm, P.A., Orlando, Florida; and Michael J. Brevda of Senior Justice Law Firm, Boca Raton, Florida;

for Respondent