979 So.2d 1221 (2008)
OLSTEN HEALTH SERVICES, INC., d/b/a Gentiva Health Services, et al., Appellants/Cross-Appellees,
v.
Edmond CODY, Appellee/Cross-Appellant.
No. 3D07-212.
District Court of Appeal of Florida, Third District.
April 30, 2008.
*1222 Carlton Fields and Matthew J. Conigliaro and Christopher J. Kaiser, St. Petersburg, for appellants/cross-appellees.
Ginsberg & Schwartz and Arnold R. Ginsberg; Manuel R. Morales, Jr., Miami, for appellee/cross-appellant.
Before WELLS, ROTHENBERG, and SALTER, JJ.

ON MOTION FOR REHEARING
ROTHENBERG, Judge.
We grant appellant's motion for rehearing, withdraw the opinion issued on March 5, 2008, and substitute the following opinion in its stead.
Olsten Health Services, Inc. d/b/a Gentiva Health Services ("Gentiva") and its insurer, National Union Fire Insurance Company of Pittsburgh, Pa., appeal the amended final judgment entered in favor of the plaintiff, Edmond Cody ("Cody"), following a jury trial. Cody cross-appeals from the same amended final judgment. We affirm.
Cody sued Gentiva, a home healthcare service company, for professional negligence alleging, in part, that its employees breached the standard of professional care by failing to "appropriately diagnose and treat and/or to prevent the formation or aggravation of decubitus ulcers on the Plaintiff resulting in severe and significant injuries to the Plaintiff."
The case proceeded to trial, and the jury returned a verdict finding negligence on the part of both Gentiva and Cody, which was the legal cause of his loss, injury, or damage. The jury awarded a total of $3,050,000 in economic damages and zero dollars in non-economic damages to Cody, apportioning seventy percent of the liability to Gentiva and thirty percent of the liability to Cody. Prior to trial, Cody settled with other entities for a total of $210,000. The trial court entered the final amended judgment in Cody's favor reflecting the jury's verdict and a setoff of the entire $210,000 in settlements.

I. Issues on Appeal
In this appeal, Gentiva contends, in part, that the trial court: (1) erred by denying its motion for directed verdict; (2) abused its discretion by admitting three photographs into evidence and by allowing the jury to take enlarged copies of these photographs into the jury room during its deliberations; and (3) abused its discretion by denying its proposed jury instruction.

*1223 Denial of Motion for Directed Verdict

Gentiva's primary argument in this appeal is that there was insufficient evidence of causation to submit the case to the jury. Thus, Gentiva argues that the trial court erred in denying its motion for a directed verdict. Because this Court, in reviewing a trial court's denial of a motion for directed verdict, is required to view the evidence in the light most favorable to the nonmoving party, and the record reflects expert testimony that Gentiva's employee, Yvette Campbell Edwards, R.N. ("Nurse Edwards"), breached the requisite standard of care, and that Cody's injury was proximately caused by the breach, we conclude that the trial court did not err in denying Gentiva's motion for a directed verdict. See Posner v. Walker, 930 So.2d 659, 665 (Fla. 3d DCA), review denied, 944 So.2d 348 (Fla.2006); Schreidell v. Shoter, 500 So.2d 228, 232 (Fla. 3d DCA 1986) ("A directed verdict is proper only when the record conclusively shows an absence of facts or inferences from facts to support a jury verdict, viewing the evidence in a light most favorable to the nonmoving party.").
The facts, viewed in the light most favorable to Cody, as the nonmoving party, are as follows. On September 1, 2000, Cody, the victim of a crime, was rendered a paraplegic. Thereafter, he was treated at a rehabilitation hospital, and he was discharged on November 15, 2000. Upon discharge, Cody's physician, Dr. Banovac, prescribed daily home health nursing care to monitor his "almost-healed" Stage 2 decubitus pressure ulcer. Gentiva was hired to provide Cody's home health nursing care, and Gentiva assigned its employee, Nurse Edwards, to care for Cody. When Cody's insurer did not approve daily visits, a reduced nursing plan was approved by Dr. Banovac.
Nurse Edwards visited Cody for the first time on November 16, 2000, the day after he was discharged from the rehabilitation hospital. During this visit, she conducted an admission assessment and a wound assessment on Cody, noting that the pressure ulcer located in the area of his tailbone, measured 5 cm by 0.4 cm wide and 0.2 cm deep. Based on her assessments, Nurse Edwards' plan called for the pressure ulcer to be completely healed within three weeks. Following her visit, Nurse Edwards left a voicemail message for Dr. Banovac.
Nurse Edwards' next visit to Cody's home was on November 19, wherein she noted that his pressure ulcer was "100% pink" with no odor.
The following day, on November 20, Nurse Edwards returned to the Cody residence for the next scheduled visit, but she was unable to assess Cody's situation or treat his wound because the front gate that surrounds the home was locked. After unsuccessfully attempting to get buzzed in, Nurse Edwards departed, left a note on the front gate, and left a voicemail message for Dr. Banovac.
Nurse Edwards, however, examined Cody the following day, November 21, and noted that the pressure ulcer was only "90% pink" with a "fetid" odor, a condition which did not improve over the next twenty-four hours since in her notes of November 22, Nurse Edwards reported that there were no changes in the pressure ulcer. Although Nurse Edwards observed these negative changes to the wound on November 21 and November 22, she only left a voice mail message for Dr. Banovac on November 21 and did not even attempt to contact Dr. Banovac on November 22.
Nurse Edwards returned on November 23 for the next scheduled visit, but once again, the front gate was locked, and no one answered when she attempted to get *1224 buzzed in. She left a note on the front gate, and left a voicemail message for Dr. Banovac.
When Nurse Edwards returned to the Cody house the following morning, on November 24, she examined Cody and noted that the pressure ulcer continued to be "90% pink" with a "fetid" odor; there was swelling in his right lower extremity; and she was unable to determine whether the necessary wound care was being followed. Despite these observations, Nurse Edwards did not attempt to contact Dr. Banovac, alter Cody's treatment, or attempt to see Cody over the next two days.
Nurse Edwards' next contact with Cody occurred on November 27. On that day, she reported that there was no odor from the pressure ulcer. However, on that same day, the home healthcare aid observed that Cody was very cold and having chills. Nurse Edwards' notes, however, do not reflect this observation.
The next two visits were scheduled for November 28 and 29. However, the front gate was locked and no one answered when Nurse Edwards attempted to get buzzed in. As before, Nurse Edwards left messages on the front gate, and she also allegedly left voicemail messages for Dr. Banovac.
When Nurse Edwards saw Cody the following day, on November 30, she noted serious changes to the wound. There was an increase in fetid serous drainage from the wound; the wound had a fetid odor; eighty percent of the wound was necrotic; the necrotic tissue was "undermined," which signifies that the edges of the wound had separated from the underlying tissue; and the pressure ulcer was significantly larger, measuring 9 cm by 8 cm wide and 1 cm deep. Again, Nurse Edwards merely left a voicemail message for Dr. Banovac, and she did not alter the visitation schedule or attempt to see Cody over the next two days to monitor the condition of his pressure ulcer even though it was clear that the wound was worsening substantially.
When Nurse Edwards returned two days later, on December 1, she noted that the pressure ulcer consisted of forty percent necrotic tissue and she instructed Cody's family to take him to Dr. Banovac's office. Later that day, Cody was admitted to the hospital with a Stage 4 pressure ulcer that had reached his tailbone. After three weeks of treatment in the hospital, Cody's pressure ulcer measured 20 cm by 30 cm.
During the ensuing years, Cody's pressure ulcer underwent various changes, improving at times and worsening at times. Although Cody has endured numerous procedures and treatment at various facilities, his pressure ulcer has never completely healed. In fact, tissue from other parts of his body had to be used to create a "flap" enclosure in an attempt to cover the wound.
At trial, Cody presented the expert testimony of Janice Cuzzell, a Registered Nurse and Board Certified Wound Care Specialist. Cuzzell's testimony and expert opinions were based, in part, on her review of Cody's numerous medical records, including those generated by Gentiva and Nurse Edwards; admission and discharge summaries from numerous hospitals and health centers; depositions of numerous nurses and doctors; and Cody's deposition.
Based on Cuzzell's review of Nurse Edwards' initial assessment, Cuzzell concluded that Cody was "at very very high risk for pressure related complications" because he was paralyzed, and therefore, "could not feel the pain" stemming from the pressure ulcer. Cuzzell testified that it was her professional opinion that Nurse *1225 Edwards, "while employed by Gentiva Health Services, did indeed breach the standard of nursing care." Cuzzell emphasized that based upon Nurse Edwards' documentation, the pressure ulcer showed signs of deterioration as early as November 21 because the pressure ulcer changed from being "100% pink" with no odor on November 19, to "90% pink" with a "fetid" odor on November 21. Cuzzell explained that when tissue is "pink," the pressure ulcer is "getting a good vascular supply and it's healing." She also stated that the "fetid" odor was significant, explaining:
What a fetid odor would mean to me is that there is some infectious process going on, probably at this point right under the skin. And you don't often see it on the surface, that there has been progressive cellular damage. . . . And as a result of that, the tissue necroses, and you have an odor of dying flesh.
Thus, Cuzzell testified that in her expert opinion, Nurse Edwards should have had a "one on one conversation with a physician, not an answering machine" when she noticed that the pressure ulcer was deteriorating, Cody was depressed, and his family was "overwhelmed." Cuzzell testified that Cody should have been "evaluated further for infection"; Nurse Edwards breached the standard of care by not "get[ting]" him to a physician on or about November 21; and if he had been seen by a physician and/or taken to an emergency room on November 21, the "fissure" (the almost-healed Stage 2 decubitus pressure ulcer) would not have progressed into a Stage 4 pressure ulcer, and therefore, Cody "would not have gone through the five plus years of suffering with a stage four [pressure ulcer]."
Cuzzell's testimony also reflects that Nurse Edwards failed to recognize symptoms demonstrating that Cody's condition was deteriorating. For example, Cuzzell testified that Cody was showing symptoms of septicemia on November 27. She explained that septicemia is caused by the entry of bacteria into the bloodstream, and that her conclusion was based, in part, on the fact that he was very cold and having chills on that day.
Cuzzell opined that on November 30, Cody also showed signs of "significant deterioration," and that Nurse Edwards breached the standard of nursing care by not "insur[ing] timely intervention . . . when he started to show signs and symptoms of infection," and that the failure to timely intervene led "to the development of the stage four ulcer that has never really completely healed in this case."
Based on the evidence and the expert testimony of Cuzzell, who is a Registered Nurse and Board Certified Wound Care Specialist, we find that the trial court properly denied Gentiva's motion for a directed verdict. Cuzzell testified that Nurse Edwards breached the standard of care, in part, by not timely intervening when Cody "started to show signs and symptoms of infection." Moreover, contrary to Gentiva's assertion, Cody did not fail to prove causation without speculation, as Cuzzell testified that Nurse Edwards' failure to timely intervene, led "to the development of the stage four ulcer that has never really completely healed in this case."
Admission of Photographs into Evidence and Allowing Poster-Size Copies of Photographs to be Taken into Jury Room
During Cuzzell's testimony, Cody's counsel introduced, over Gentiva's objection, three 8" x 10" photographs taken in 2006 of Cody's large pressure ulcer. Poster-size copies of these exact photographs were used as demonstrative aids by Cody's counsel during Cuzzell's testimony. After the jury retired to deliberate, the trial *1226 court learned that the three photographs were missing. The trial court questioned the court clerk and the lawyers, and ascertained that each had looked for the photographs, but could not locate them; the parties were not responsible for the missing photographs; and the three blowups were exact copies of the missing photographs. The trial court, over Gentiva's objection, allowed the jury to take the three enlarged copies of the 8" × 10" photographs into the jury room.
Gentiva contends that the trial court abused its discretion by admitting the three photographs into evidence and in allowing the enlargements to be viewed by the jury during its deliberations.
A trial court's ruling on the admissibility of evidence is reviewed on appeal for an abuse of discretion. See H & H Elec., Inc. v. Lopez, 967 So.2d 345, 347 (Fla. 3d DCA 2007) ("We review discretionary issues involving the admission of evidence . . . for abuse of discretion."); Hayes v. Wal-Mart Stores, Inc., 933 So.2d 124, 126 (Fla. 4th DCA 2006) (holding that trial court's ruling on admissibility of evidence will not be reversed on appeal unless trial court abused its discretion).
Photographs are admissible if relevant to establish a material fact in the lawsuit. See Bush v. State, 461 So.2d 936 (Fla.1984); McFarlane v. State, 593 So.2d 305 (Fla. 3d DCA 1992). In the instant case, Cody's counsel argued that Nurse Edwards' negligence, which occurred in 2000, resulted in almost six years of additional treatments and procedures. Contrary to Gentiva's assertion, Cody, through Cuzzell's testimony, established that the 2006 photographs were sufficiently connected to Nurse Edwards' care of Cody in 2000. Cuzzell explained that the photographs depict the "natural and continuous progression" of the pressure ulcer as it existed on December 1, 2000. Cuzzell testified that once a decubitus pressure ulcer reaches Stage 4, which signifies that the infection has reached the bone, a surgeon then attempts to cut out all of the necrotic tissue and the infected bone, but that it is difficult for a surgeon to tell when all of the infected bone has been removed. Therefore, even if a small part of the infection remains, the infection will reoccur. Thus, we find that the photographs were relevant.
Gentiva also contends that even if the photographs were relevant, the trial court abused its discretion by admitting the photographs into evidence arguing that the probative value of these "gruesome" photographs was substantially outweighed by the danger of unfair prejudice. Although the photographs[1] in question are not pleasant to look at, we conclude that the trial court did not abuse its discretion by admitting them into evidence. See § 90.403, Fla. Stat. (2006) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. . . . ").
We also find that the trial court did not abuse its discretion by allowing the jury to take the blowups of the three photographs into the jury room. After learning that the three photographs were missing, the trial court ascertained that the clerk and the lawyers had looked for the photographs but could not locate them; the photographs were not missing due to the fault of either party; and the blowups were simply enlarged copies of the missing photographs. In light of these circumstances, and the fact that the blowups *1227 were used as demonstrative aids during Cuzzell's testimony, we find that the trial court did not abuse its discretion by allowing the jury to take the blowups into the jury room during the jury's deliberations. Although we find that the trial court did not abuse its discretion by allowing the blowups to be taken into the jury room during the jury's deliberations, we find that any error was harmless as the complained-of error did not result in a miscarriage of justice. See Broward County Sheriff's Office v. Brody, 969 So.2d 447, 449-50 (Fla. 4th DCA 2007).

Denial of Gentiva's Requested Jury Instruction
Gentiva requested the following special jury instruction, regarding Cody's burden of proof:
The existence of a medical injury shall not create any inference or presumption of negligence against the home healthcare services provider, and the Plaintiff maintains the burden of proving that an injury was legally caused by a breach of the prevailing professional standard of care by the home healthcare services provider.
The trial court denied the requested jury instruction, finding that the proposed instruction was redundant in light of the standard jury instructions that were given.
For an appellate court to reverse based on the denial of a proposed jury instruction, the "appellant must establish that the requested instruction contained an accurate statement of the law, that the facts of the case support the giving of the instruction, and that the instruction was necessary for the jury to properly resolve the issues in the case." Giordano v. Ramirez, 503 So.2d 947, 949 (Fla. 3d DCA 1987). However, an appellate court will not reverse "where the subject of the proposed instruction is covered in other charges given by the court or where failure to give the instruction is not shown to be prejudicial." Id.
With these principles in mind, in reviewing the trial court's decision to deny the requested jury instruction, we take into account not only the requested instruction but all instructions given to the jury. The requested instruction was patterned after section 766.102(4), Florida Statutes (1999),[2] which provides, in part, as follows:
The existence of a medical injury shall not create any inference or presumption of negligence against a health care provider, and the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider.
Clearly, the requested instruction contains an accurate statement of the law and the facts in the instant case support the giving of the instruction. However, as the requested jury instruction was adequately covered by the standard jury instructions regarding negligence and Cody's burden of proof, Gentiva is not entitled to reversal based on the trial court's denial of its requested jury instruction. Giordano, 503 So.2d at 949.
We decline to specifically address the remaining issues raised by Gentiva in this appeal as we find they lack merit.

II. Issue on Cross-Appeal
On cross-appeal, Cody contends that the trial court erred by setting off the entire $210,000 in settlements from the jury's *1228 verdict. As we find no error, we affirm. See D'Angelo v. Fitzmaurice, 863 So.2d 311, 316 (Fla.2003); Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc., 659 So.2d 249, 254 n. 3 (Fla.1995).
Affirmed.
NOTES
[1] The trial court admitted three 8" × 10" photographs into evidence. However, as explained, these photographs have been lost, and therefore, we have examined the postersize copies of these photographs.
[2] Section 766.102(4) has been renumbered, and currently appears in section 766.102(3), Florida Statutes (2007).