# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D18-511

_____

SPECIALTY HOSPITAL-
GAINESVILLE, INC.,

Appellant/Cross-Appellee,

v.

CHARLES BARTH,

Appellee/Cross-Appellant.

_____

On appeal from the Circuit Court for Alachua County.
Monica J. Brasington, Judge.

July 15, 2019

B.L. THOMAS, J.,

Appellant/Cross Appellee Specialty Hospital-Gainesville appeals a final judgment awarding Appellee/Cross Appellant Charles Barth damages under section 415.1111, Florida Statutes, which provides a cause of action for a vulnerable adult against "any *perpetrator*" where the vulnerable adult has been "abused, neglected, or exploited as specified in this chapter" (emphasis added). Mr. Barth filed a complaint asserting damages under this theory and sought damages for medical malpractice under chapter 766, Florida Statutes. The jury found Appellant liable for damages on both counts.

On the medical-malpractice issue, Mr. Barth cross appeals the trial court's ruling designating Heartland of Orange Park as a non-

party under *Fabre v. Martin*[1], and section 768.81(3), Florida Statutes. The jury found that Heartland's negligence was also at fault for medical negligence and damages during Heartland's post-operative treatment of Mr. Barth after he was treated at Specialty Hospital of Gainesville.

We reverse in both appeals. We hold that under *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*,[2] an allegation of medical negligence subject to the statutory requirements of chapter 766, Florida Statutes, cannot form the basis of a claim under section 415.1111, Florida Statutes. On the cross appeal, we reverse and hold that Specialty is responsible for the full amount of damages to Mr. Barth on the medical-negligence claim.

*Background*

After suffering paralysis during an aortic-aneurism operation at Shands Teaching Hospital and Clinics, Inc., Mr. Barth was transferred to Select Specialty Hospital-Gainesville, a long-term acute-care facility which provides medical treatment to wean patients off breathing ventilators and wound care. Generally, such hospitals focus on patients who are not healthy enough to return home or enter an assisted-living facility, but who need medical treatment for extended time periods. After Mr. Barth was treated at Specialty, where he suffered a deep-tissue pressure ulcer, he was transferred back to Shands and eventually Heartland of Orange Park for treatment of the injury, including surgery to replace necrotic skin and additional surgery necessitated by the infections.

Mr. Barth later brought a two-count civil suit against Specialty of Gainesville. Count I of the amended complaint alleged Specialty committed medical malpractice by failing to reposition Mr. Barth or otherwise prevent avoidable pressure ulcers, causing catastrophic injuries. The parties stipulated that Mr. Barth complied with the applicable pre-suit notice requirements under chapter 766, Florida Statutes, for this count.

Specialty Hospital pled comparative fault by a non-party tortfeasor as an affirmative defense, which identified Heartland of

---

[1] 623 So. 2d 1182 (Fla. 1993).
[2] 983 So. 2d 717 (Fla. 1st DCA 2008).

2

Orange Park Florida as a subsequent treater of Mr. Barth. Mr. Barth filed a motion for summary judgment on Specialty 's comparative fault defense, arguing that Specialty was liable for any negligence of subsequent treating providers because Specialty caused the injury under *Stuart v. Hertz Corp.*[3] The trial court denied Mr. Barth's motion for summary judgment.

Count II alleged Specialty abused and neglected Mr. Barth in violation of the Adult Protective Services Act, Sections 415.101-415.113, Florida Statutes, by improperly restraining Mr. Barth and by not responding to his calls for assistance, even when he believed he was suffocating or choking. Count II alleged that Mr. Barth was a "vulnerable adult" and that Specialty was a "caregiver," as those terms are defined in section 415.102, Florida Statutes.

Specialty Hospital moved to dismiss Count II, arguing that it described medical negligence and therefore could not support a cause of action under *Bohannon* and section 415.1111, Florida Statutes. The trial court denied Specialty's motion to dismiss and denied a later motion for summary judgment that made the same argument. Specialty moved in limine to prohibit Mr. Barth from entering expert medical testimony to prove his Chapter 415 claim, which the trial court granted.

The following evidence was presented in the two-week jury trial.

Carol Snyder, a wound care nurse, testified that Mr. Barth developed a Stage II deep-tissue sacral bedsore at Specialty's facility. She testified that once any bedsore is discovered, regardless of stage, it should be assessed and documented every shift. She said Mr. Barth was given a specialty bed and Tegaderm was placed on the wound to absorb drainage.

The parties stipulated that Mr. Barth's medical expenses were $363,531.24. Specialty admitted that the medical costs were reasonable and necessary but denied causing the need for the entire amount of medical treatment.

---

[3] 351 So. 2d 703 (Fla. 1977).

3

Mackenzie Slay, corporate representative for Specialty, testified that Mr. Barth developed bedsores at Specialty's facility and that Specialty was noncompliant with policies and procedures. She testified that daily individualized orders are required for restraints and that improper use of restraints is abusive and enhances the risk of injuries. She stated it is against Specialty's policy to fail to respond to call button requests or to place call buttons out of reach. She said timely repositioning of patients is the best way to prevent deep tissue bedsores and is especially important for patients in restraints, and that paraplegics are known to have a high risk for developing bedsores.

Karen Harrison, a registered nurse, testified that patients at Specialty's facility are at high risk for bedsores due to the type of facility. She said that had an incident report been filed, nurses should have quickly attended to Mr. Barth.

Dr. Shahrzad Grey, MD, a treating physician at Heartland, testified by deposition that Mr. Barth arrived at Heartland on June 1, 2012 and stayed there until August 13. She testified that Mr. Barth's records indicated a Stage II sacral wound when Mr. Barth was discharged from Specialty's facility. Dr. Grey had no opinion, however, on where or how Mr. Barth developed his pressure sores. Dr. Grey testified that the wound care team at Heartland later noted Mr. Barth's sacral injury as a Stage IV wound.

Dr. Grey testified that the sacral wound was noted as "suspected deep tissue injury" the day after Mr. Barth was admitted to Heartland, and "did not make any change" at Heartland. When asked, "you're saying he was always a Stage IV the whole time he was at Heartland?" she answered: "Based on what I see here, the PUSH score is a 16 the whole time."

Joyce Black, Ph.D., an expert on deep-tissue injury, opined that Specialty failed to prevent Mr. Barth's deep-tissue pressure ulcer which manifested in their care. She stated that the wound was avoidable. Dr. Black testified that Specialty's nurses failed to turn Mr. Barth from side to side to prevent excessive pressure on the sacral area of his body which caused the deep-tissue injury. She also testified that Specialty's nurses failed to follow doctors' orders and applicable protocols to treat pressure injuries. She

4

testified that because Mr. Barth was not turned regularly at Specialty's facility, he developed the injury which required multiple surgeries to attempt to heal those injuries. Dr. Black was *not* critical of Mr. Barth developing a Stage I wound at Specialty, calling it a warning sign, but opined that nurses were negligent after learning of the wound. Dr. Black testified that although restraint of Mr. Barth's arms was "the last option" to deal with confused or agitated patients, Specialty attempted nothing else.

Dr. Black testified about Mr. Barth's treatment at Heartland, where Mr. Barth was transferred for aggressive treatment of his sacral wound. She testified she would have applied different bandages than Heartland used, but she said "in the end it wouldn't have changed the outcome."

On cross-examination, Dr. Black reiterated that "failure to move [Mr. Barth] is where the negligence is." Dr. Black opined that Shands incorrectly assessed Mr. Barth's wound as a Stage II pressure sore when it received him after discharge from Specialty, because the injury was a full-thickness wound when Mr. Barth arrived at Shands. Dr. Black admitted she did not notice Mr. Barth had to wait fifty-six days at Heartland before getting a specialty mattress or that in the seventy-four days Mr. Barth was at Heartland, there were only two references to repositioning Mr. Barth. She testified that if true, such conduct would constitute breaches of the standard of care.

Mr. Barth testified by video deposition that he was admitted to Shands for aortic-aneurism repair but was rendered a paraplegic during the procedure. Mr. Barth's first concrete memory of Specialty's facility was of his arms being tied down to the sides of the bed with a breathing tube in his neck. He testified that the glass across his room was reflective and he could see nurses laughing and joking about whether anyone would respond to his button calls, saying "it was a game to them." He said he had no memory of ever being repositioned by Specialty's staff. He said that whenever he was unable to breathe, he threw things into the hall and pulled out his monitor wires to get nurses to come in, but they would just lecture him and tighten his restraints.

Maggie Barth, Mr. Barth's daughter, testified that her father was put in restraints the day he was admitted to Specialty, and

5

that when she arrived each morning, he would be lying on his back. When cross-examined about injuries found at other facilities, Ms. Barth said, "You guys [Specialty] just did the sacral wound." She agreed Heartland should have prevented Mr. Barth from developing additional pressure sores but said it was harder for Heartland to move him due to his sacral wound.

Dr. Christopher Davey, an expert in wound care, testified that Mr. Barth developed a preventable deep-tissue sacral injury at Specialty's facility. He testified that the sacral wound was not a Stage II pressure ulcer when Mr. Barth was admitted to Heartland – that it was "much worse than that." On cross-examination, Dr. Davey admitted that some patients develop pressure sores even with the best of care, but opined that in Mr. Barth's case, the injury was caused by negligence. Dr. Davey testified that a Stage II pressure sore is not itself indicative of negligence and he admitted that Mr. Barth's sore was documented as a Stage II sore. Dr. Davey opined that the wound had developed into a Stage III wound at Specialty's facility. He further testified that if Heartland failed to reposition Mr. Barth regularly, it would be a breach of the standard of care and would be enough to cause a Stage II sore to advance to a Stage IV wound.

Michelle Barth, Mr. Barth's oldest child, testified that Mr. Barth would "get very agitated" if the nurses did not respond to his calls. She admitted that she believed Heartland also failed to provide adequate care to Mr. Barth. Dr. Christopher Leber, a physical rehabilitation specialist, testified about damages and a life-care plan he prepared for Mr. Barth for the pressure sores. He did not prepare an opinion on causation.

Dianne Cook, a nurse who worked for Specialty, testified that keeping a patient in restraints without a doctor's order was a deviation of the standard of care. She further testified that using restraints required a preliminary assessment of the patient's safety and a doctor's order, with new orders every twenty-four hours.

Dr. Lalit Kanaparthi, Mr. Barth's treating physician at Specialty's facility, testified that he ordered Mr. Barth to be restrained because he was at high risk of injury from pulling out his newly installed ventilator and feeding tubes. Dr. Kanaparthi

testified that he never ordered restraints to punish patients; he only ordered them if there was a high risk of life-threatening injuries.

Dr. Charles Wilson, a physician at Specialty's facility, testified that he would order restraints for patients to protect a feeding tube, a tracheostomy, or a central feeding line. He testified that pulling out a feeding tube could cause a catastrophic health risk for the patient.

Dr. Inna Sheyner, Specialty's expert in geriatric medicine, testified that she did not see any deviations from the standard of care by Specialty's staff. Dr. Sheyner also opined that Mr. Barth's wound progressed to a Stage IV pressure ulcer sometime after he was discharged from Specialty's hospital. Dr. Sheyner testified that it would be impossible for Mr. Barth's wound to take as long to progress to a deep-tissue sore as Mr. Barth's experts had suggested.

At the close of trial, Specialty renewed its motion for directed verdict; the trial court allowed both of Mr. Barth's claims to go to the jury. The jury found Specialty liable for medical malpractice and awarded damages in the amount of $561,748.13 for present and future medical costs and pain and suffering. The jury found that there was comparative fault on the part of Heartland, apportioning 30% of fault to Specialty and 70% of fault to Heartland. The jury also found that Specialty was a caregiver under Chapter 415, Florida Statutes, and that it neglected or abused Mr. Barth by the improper use of restraints and the failure to respond to Mr. Barth's calls for medical assistance. The jury awarded damages on this claim in the amount of $25,000. The jury found that punitive damages were not warranted. Specialty moved to set aside the verdict, and the trial court denied the motion. Mr. Barth moved for attorneys' fees under section 415.1111, Florida Statutes, following the verdict.

*Analysis*

*I. The Appeal*

As the supreme court has held, an "order on a motion for directed verdict or for judgment notwithstanding the verdict is reviewed de novo. . . [and the appellate court] must affirm the

7

denial of the motion 'if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party." *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009). "In addition, [the reviewing court] must view the evidence and all inferences of fact in the light most favorable to the nonmoving party." *Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017).

In *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.,* 983 So. 2d 717, 720-21 (Fla. 1st DCA 2008), this Court held that Chapter 415 "was not intended by the Florida Legislature to provide an alternative cause of action for medical negligence." *Id.* at 721. The holding in *Bohannon* excluded any medical-malpractice or medical-negligence claims from the orbit of chapter 415. And since our decision in *Bohannon,* rendered more than a decade ago, the legislature has not abrogated that decision, indicating legislative approval: "Long-term legislative inaction after a court construes a statute amounts to legislative acceptance or approval of that judicial construction. *Goldenberg v. Sawczak,* 791 So. 2d 1078, 1081 (Fla. 2001).

The Third District has interpreted the statute as we did in *Bohannon* and continue to interpret the statute here. In the same year this court decided *Bohannon,* the court held in *Tenet S. Fla. Health Sys. v. Jackson,* that the hospital was not a "caregiver" under section 415.102 (4), Florida statutes, but even assuming *arguendo* that the hospital had become a caregiver, its alleged "failure to appreciate early implication of increasing respiratory rate and sore throat in a patient with recent neck surgery and multiple allergies" was related to medical care or services. 991 So. 2d 396, 399 (Fla. 3d DCA 2008). And because the challenged conduct involved medical care "negligently rendered or not rendered at all resulting in injury[,]" remedies provided under Chapter 766 were the appropriate avenue of relief for persons injured as a result of medical negligence or malpractice. *Id.* And neither our court in *Bohannon* or the Third District in *Jackson* held that a plaintiff could simply *add* a count for medical negligence to a suit seeking relief under chapter 415 *based on allegations of medical negligence.*

Chapter 766, Florida Statutes, provides the exclusive remedy for claims "arising out of the rendering of, or the failure to render, medical care or services." § 766.106(1)(a), Fla. Stat. (2018). To

determine if a claim asserts medical malpractice, a court will "look to whether the plaintiff must rely upon the medical negligence standard of care as set forth in section 766.102(1)." *National Deaf Acad., LLC v. Townes*, 242 So. 3d 303, 309 (Fla. 2018). In *Townes*, a violent altercation broke out at a treatment facility and staff members tackled a resident and placed him in a "TACT protective hold." *Id.* at 306. Medical and non-medical staff were trained to perform the TACT hold and were authorized to decide when it was appropriate. *Id.* at 307. Because the TACT hold was administered in that instance to protect residents of the facility, not provide medical treatment to the plaintiff, the supreme court held it was not directly related to medical care or services. *Id.* at 314. Moreover, the allegations did not state medical negligence, as the "administration of the hold 'did not require medical skill or judgment as non-medical staff were taught the procedure and were authorized to decide whether to employ it.'" *Id.* (quoting *Townes v. Nat'l Deaf Acad., LLC*, 197 So. 3d 1130, 1136 (Fla. 5th DCA 2016)).

This is the relevant analysis to determine whether a claim asserting abuse of a vulnerable adult can be brought under chapter 415. If the claim involves medical negligence which requires compliance with the pre-suit procedures and other provisions of chapter 766, the claim cannot be asserted under chapter 415; if the claim asserts non-medical negligence or criminal conduct, it can be asserted under chapter 415.

That statute refers to "perpetrators" for a reason. § 415.1111, Fla. Stat. (2018). The entire legislative scheme of chapter 415 is to punish "perpetrators" of abuse, neglect or exploitation, not medical negligence. *Id.*

The overarching and critical sentence in section 415.1111, Florida Statutes, reads as follows: "A vulnerable adult who has been abused, neglected or exploited[4] as specified in this chapter has a cause of action *against any perpetrator* and may recover actual and punitive damages for such abuse, neglect or exploitation." (Emphasis added). Supporting our decision in *Bohannon,* and our analysis here, the legislature in the

---

[4] Both parties agree that Specialty was not liable for any exploitation of Mr. Barth.

*immediately preceding subsection* of 415.1111, Florida Statutes provides that: "A person who knowingly and willfully fails to report a case of known or suspected abuse, neglect, or exploitation of a vulnerable adult, or who knowingly and willfully prevents another person from doing so, commits a misdemeanor of the second degree, punishable as provided in s.775.082 or s.775.083." Under the theory of Appellee, and the appellant in *Bohannon,* every nurse or doctor, or any other person, that was aware of medical negligence which could somehow be equated with abuse or neglect under chapter 415, commits a crime, if the nurse or doctor is aware of any "perpetrators" fails report such conduct to the Department of Children and Families.

We must construe the statute *in para materia*:

A basic tenet of statutory interpretation is that a "statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts." *Acosta v. Richter,* 671 So.2d 149, 153–54 (Fla.1996). Accordingly, "statutory phrases are not to be read in isolation, but rather within the context of the entire section." *Id.* at 154. In other words, "[j]ust as a single word cannot be read in isolation, nor can a single provision of a statute.... A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Smith v. United States,* 508 U.S. 223, 233, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

*Jones v. ETS of New Orleans, Inc.*, 793 So. 2d 912, 914–15 (Fla. 2001).

The entire legislative scheme of chapter 415 is to protect vulnerable adults, not to provide a duplicative remedy for medical malpractice. The rationale is apparent from the very first section of the act, 415.101, Florida Statutes, which specifically expresses legislative intent: "The Legislature recognizes that there are many persons in this state, who, because of age or disability, are in need of *protective services*." (Emphasis added). This is further explicated in section 415.103(1), Florida Statutes, regarding the "Central Abuse Hotline": "The department shall establish and maintain a central abuse hotline that receives all reports made pursuant to section 415.1034 in writing or through a statewide toll-free

telephone number. *Any person* may use the statewide toll-free telephone number to report known or suspected abuse, neglect, or exploitation of a vulnerable adult[.]" (Emphasis added). This subsection then provides detailed procedures for the department to investigate such reports.

This chapter does not intend to criminalize health care providers or anyone else who may fail to report *medical negligence*, the subject of an entirely different chapter with includes extensive procedures, investigations, and protections, including pre-suit investigations: "Presuit investigation of medical negligence claims and defenses . . . shall apply to *all* medical negligence claims and defenses." § 766.203(1), Fla. Stat. (2018) (emphasis added).

And we note that long before pre-suit and other specialized procedures were implemented by the Legislature, the Florida Supreme Court recognized the specialized unique nature of medical-malpractice actions, stating that the "complex issues of liability to be resolved in a medical malpractice action are *foreign* to the resolution of liability in the typical personal injury suit." *Stuart v. Hertz Corp.,* 351 So. 2d 703, 706 (Fla. 1977) (emphasis added). The same logic applies here: the complex issues of medical negligence under chapter 766 cannot be permitted to be litigated as a parallel suit under section 415.1111, Florida Statutes, designed to address a completely different type of wrongful conduct.

We recognize section 415.1111, Florida Statutes, states that the "remedies provided in this section are in addition to and cumulative with other legal and administrative remedies provided to a vulnerable adult." But this sentence cannot be logically interpreted to mean that a claim of medical negligence can be transformed into a claim against a nurse or doctor as a "perpetrator" of abuse, neglect, or exploitation, as we correctly recognized in *Bohannon. See also Sistrunk v. Hoshall*, 530 So. 2d 935, 936 (Fla.1st DCA 1988) ("Although failure to obtain informed consent may also constitute a technical battery, labeling the act an intentional tort does not change the action from what it is, a species of medical negligence"). The allegations here are all "species of medical negligence." While the sentence in section 415.1111, Florida Statutes, provides that its remedies are "cumulative" to other legal and administrative remedies, this

11

language must be interpreted to refer to remedies outside of chapter 766, Florida Statutes, such as negligence actions not involving medical care or administrative actions against caregivers who allow the abuse, neglect or exploitation of vulnerable adults.

Appellee argues that the improper application and long-term use of restraints was abuse or neglect of a vulnerable adult, not medical negligence. Mr. Barth also argues that the nurses' failure to promptly respond to his calls for help states neglect of a vulnerable adult, not medical malpractice. Appellant concedes that Mr. Barth could have been found a vulnerable adult and that hospitals can be "caregivers" in certain circumstances. *See Bohannon*, 983 So. 2d at 720-21. But Specialty argues that it was providing medical treatment, and that the evidence of improper use of restraints and failure to timely respond to calls for help stated medical negligence, thereby falling within Plaintiff's Chapter 766 claim. We agree.

All evidence presented by Appellee indicated that the abuse or neglect was directly related to medical care or services. *See Bohannon*, 983 So. 2d at 721; *Tenet*, 991 So. 2d at 399. Unlike in *Townes*, where non-medical staff were authorized to employ the TACT hold on a judgment call basis, the restraints here required individualized orders each day from a doctor. *See also* 42 C.F.R. § 482.13(e)(5) ("The use of restraint or seclusion must be in accordance with the order of a physician or other licensed independent practitioner who is responsible for the care of the patient . . . ."). Moreover, whereas the tactical hold in *Townes* was used to control a violent situation and protect residents, a doctor ordered Appellee's restraints to protect the ventilation and feeding tubes installed after Mr. Barth's recent surgery.

Appellant argues that the nurses' alleged failure to respond to his distress calls alleged medical negligence, and Appellee testified that the nurses failed to help him while he believed he was suffocating or choking. This testimony addressed whether his breathing anxiety on a new ventilator required nursing intervention and thus implicates medical skill and judgment. The reason Mr. Barth needed relief from his respiratory distress was because he needed *medical treatment. See Palms W. Hosp. LP v. Burns,* 83 So. 3d 785*,* 788 (Fla. 4th DCA 2011) (where a request

12

was made for help from a GI doctor, the on-call doctors' failure to respond stated medical negligence); *South Miami Hosp., Inc. v. Perez,* 38 So. 3d 809, 812 (Fla. 3d DCA 2010) (holding that allegations of nurses failing to monitor a patient and leaving him unattended and unrestrained was a claim arising from failure to render medical services).

This is not to say Mr. Barth failed to prove that his restraints were negligently applied or that his nurses were not negligent in their responses to his calls for help. But the responses and restraints were *part* of Plaintiff's medical treatment, and they required a degree of medical skill or judgment. *See Townes*, 242 So. 3d at 309. The assertions regarding the restraint lie in medical negligence, not abuse or neglect as prohibited in section 415.1111, Florida Statutes.

Appellee's claims were contained within his suit for damages from medical malpractice and could not be maintained as a separate count for damages resulting from alleged abuse or neglect of a vulnerable adult under chapter 415. To hold otherwise would be to completely disregard the legislature's mechanism for claims for damages for alleged medical malpractice under chapter 766. Such a holding would be inconsistent with the legislature's comprehensive remedy for those claims which necessarily involved consideration of the competing interests in preventing such claims from unduly interfering with the effective delivery of complex professional medical care while preserving patients' constitutional rights to access to courts.

We do not hold that claims under section 415.1111, Florida Statutes, could never be asserted against a hospital or health-care provider. As this court recognized in *Bohannon,* such claims could be maintained for non-medical abuse or neglect. For example, if a nurse or doctor committed a sexual offense against a vulnerable adult or attempted to harm a vulnerable adult such a claim could be asserted under section 415.1111, Florida Statutes. And any person who knew of such abuse and failed to report it to law enforcement could be charged under section 415.111, Florida Statutes.

We therefore reverse the appeal and remand with directions to enter a directed verdict for Specialty Hospital on Count II of the

13

verdict. As a matter of law, no cause of action existed under section 415.1111, Florida Statutes, based on the allegations of medical negligence, which encompassed all claims asserted by Mr. Barth.

## *II. The Cross-Appeal*

Denial of a motion for directed verdict on comparative fault and denial of a motion for judgment notwithstanding the verdict are both reviewed de novo. *Jackson Cty. Hosp. Corp. v. Aldrich*, 835 So. 2d 318, 325-326 (Fla. 1st DCA 2002). A trial court should only grant directed verdict if no evidence was presented on which the jury could rely. *Id.*

Adding a non-party to the verdict form requires the defendant to prove by a preponderance of the evidence that the non-party's negligence caused the plaintiff's injury. § 768.81(3)(a)2., Fla. Stat. (2012); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (because "the testimony established a no better than even chance for [plaintiff] to survive, even had there been an immediate diagnosis of the aneurysm and emergency surgery . . . , a jury could not reasonably find that but for the negligent failure to properly diagnose and treat [plaintiff] he would not have died").

In *Chaskes v. Gutierrez*, 116 So. 3d 479, 487, 489 (Fla. 3d DCA 2013), the expert was unable to say there was a better than even chance that if the proper procedures had been followed by either defendant, the result would have been different. The Third District cited *Olsten Health Services, Inc. v. Cody*, 979 So. 2d 1221, 1225 (Fla. 3d DCA 2008), as a model for evidence that would survive a motion for directed verdict in pressure-ulcer cases. *Id.* at 487 n.26. The expert in *Cody* testified:

> [The nurse] breached the standard of care by not 'get[ting]' him to a physician on or about November 21; and if he had been seen by a physician and/or taken to an emergency room on November 21, the 'fissure' (the almost-healed Stage 2 decubitus pressure ulcer) would not have progressed into a Stage 4 pressure ulcer, and therefore, Cody 'would not have gone through the five plus years of suffering with a stage four [pressure ulcer].'

*Cody*, 979 So. 2d at 1225 (alterations in original) (emphasis omitted). This testimony was sufficient because it provided

14

evidence that the plaintiff's wound in *Cody* would not have progressed to Stage IV without the facility's negligence.

Here, Specialty argues that Mr. Barth's experts opined that Heartland breached its duty of care and allowed the Stage II pressure sore incurred at Defendant's facility to progress into a more serious Stage IV deep-tissue wound. Mr. Barth replies that the experts were equivocal about whether Heartland breached the standard of care, but that even if their testimony established duty and breach, there was no testimony of Heartland's negligence *causing* the injury. We agree.

Dr. Black and Dr. Davey did not review Heartland's records in detail. They opined, however, that failing to provide Plaintiff with pressure relief devices for forty-one days and only repositioning him twice in seventy-four days would constitute breaches of the standard of care. Specialty asked Dr. Davey:

> Q. If Heartland's records indicate that he was repositioned only twice during the 74 days he stayed [at Heartland], that would be a breach of the standard of care, would it not?
>
> A. It would.
>
> Q. And within a reasonable degree of medical probability would be enough for someone in [Mr. Barth's] medical condition to cause a Stage II pressure sore to turn to a Stage III or IV, correct?
>
> A. Yes. If you continue pressure, pressure sores get worse, no question.

Together with Heartland's records showing the actions discussed with Dr. Davey and Dr. Black, the expert testimony showed that Heartland's failure to provide pressure relief devices and reposition Plaintiff as needed were breaches of the standard of care. This testimony also established that these breaches of care *could* cause a Stage II pressure sore to develop into a Stage III or Stage IV deep tissue sore.

However, the piece of crucial evidence missing in this case is testimony that if Heartland had treated Mr. Barth with due care, his pressure sore probably would have improved, or at least would

not have deteriorated to a Stage IV. Unlike in *Cody*, 979 So. 2d at 1225, where the expert opined that the plaintiff's pressure ulcer "would not have progressed into a Stage 4 pressure ulcer," if the facility had not been negligent, no one in this case testified that, more likely than not, Mr. Barth's damages would have been different without Heartland's negligence; in fact, the experts testified that *Specialty's negligence alone made the resulting injury inevitable. Cf. Gooding*, 445 So. 2d at 1018; *Chaskes*, 116 So. 3d at 487, 489. Therefore, the trial court should have granted Mr. Barth's motion for directed verdict on Specialty's comparative-fault defense.

Dr. Davey did not testify that Mr. Barth's wound had deteriorated to Stage IV when he was discharged from Specialty's facility. Although Dr. Davey maintained that the wound was "much worse" than a Stage II wound, he opined it was a Stage III wound. Similarly, although Dr. Black testified that Mr. Barth's wound did not change in size or character at Heartland, and that "[t]he damage had been done" by the time Mr. Barth got to Heartland, she also testified that when Plaintiff was discharged from Specialty's facility to further treatment at Shands, that provider was able to successfully stall the progression of the wound and that "the damage started again" at Heartland. Dr. Black was specifically opining that Specialty's negligence made the wound's downward trajectory inevitable, but even so, her testimony showed that Mr. Barth's pressure ulcer could be stabilized temporarily with proper care, yet "continued on a downhill course" at Heartland. But regardless, Dr. Black's testimony falls short of opining that, *but for* Heartland's additional negligent conduct, Mr. Barth's injury probably would have been different; in fact, she expressly said she was not offering an opinion on how Mr. Barth's wound did or not progress at Heartland. Without any testimony that Mr. Barth's damages were the proximate result of any of Heartland's breaches of care, the trial court should not have allowed Heartland on the verdict form for any apportionment of damages.

In addition, Mr. Barth argues that even if Specialty somehow proved causation by Heartland, Mr. Barth was nevertheless entitled to a directed verdict on Defendant's comparative-fault defense, based on *Stuart v. Hertz Corp.*, 351 So. 2d 703, 707 (Fla. 1977); *see also Dungan v. Ford*, 632 So. 2d 159, 162 (Fla. 1st DCA

16

1994) (holding plaintiff was entitled to jury instruction "that the original tortfeasor was liable for damages caused by subsequent improper medical treatment which aggravates or increases the original injury"); *Sistrunk v. Hoshall*, 530 So. 2d 935, 936 (Fla. 1st DCA 1988) (holding that the original tortfeasor was liable for a subsequent treating physician's failure to obtain informed consent); *Tucker v. Korpita*, 77 So. 3d 716, 719 (Fla. 4th DCA 2011) (citing *Stuart* for the proposition that the plaintiff was entitled to a jury instruction that tortfeasor was liable for aggravated injury and damages resulting from subsequent medical provider). Mr. Barth argues that because Heartland was, at most, a subsequent medical provider who aggravated an injury caused by the initial tortfeasor, Specialty, as the initial tortfeasor, was liable even if Specialty adequately proved everything it hoped to at trial regarding Heartland. We agree and hold that Mr. Barth was entitled to a directed verdict on the non-party's purported fault under *Stuart.*

In *Stuart,* the supreme court held that a subsequent provider of medical malpractice was not a joint tortfeasor with the original tortfeasor (the owner of the car leased to an at-fault driver in an accident): "the action of the [plaintiff's] doctor was in fact *an aggravating intervening cause* of the ultimate condition of the plaintiff. The parties causing plaintiff's injuries *were not joint tortfeasors* but distinct and independent tortfeasors." 351 So. 2d at 705 (emphasis added). That is precisely the case here. Heartland was not a joint tortfeasor with Specialty because, assuming *arguendo* any medical negligence was proven by legally sufficient evidence, such negligence by Heartland was an "aggravating and intervening cause" of Mr. Barth's extensive injuries flowing from his deep-tissue pressure ulcer. The logic underlying the rationale of *Stuart* is that a wrong committed by the original tortfeasor, here indisputably Specialty, cannot be diminished or made less culpable by any subsequent tortfeasor who aggravates the original injury. This is analogous to the well-established principle in criminal law that an original criminal actor is legally culpable in a manslaughter or murder prosecution for causing a life-threatening wound, regardless of the potential aggravating factor of a lack of medical care or medical malpractice. *See, e.g.*, *Gilliams v. State*, 262 So. 3d 869, 870 (Fla. 1st DCA 2019) ("The bullet wound was a life-threatening injury for which medical malpractice or lack of

17

optimal medical care was not a legally valid defense under the circumstances").

In this case, Specialty attempted to prove that its own negligence and Heartland's negligence combined to create a serious Stage IV pressure sore, which would make them joint tortfeasors. But no evidence was presented that Heartland caused Plaintiff's *original* injury. Had evidence been entered showing causation, perhaps the jury could have legally determined, as Specialty argues, that Mr. Barth sustained a single injury, a Stage IV pressure ulcer, and that it would not have occurred without combined negligence by both Heartland and Defendant. *See Gooding*, 445 So. 2d at 1018; *Jackson*, 876 So. 2d at 12. But here*, no expert opined that Mr. Barth's injury or damages would have been any different without Heartland's negligence.* Thus, under *Stuart*, the trial court erred in allowing apportionment of damages between Specialty and Heartland, based on a lack of causation evidence.

Florida's adoption of comparative fault by statute in section 768.81, Florida Statutes, did not abrogate the *Stuart* rule, which states that an initial tortfeasor is liable for subsequent medical malpractice that adds new injuries or aggravates the initial injury. There is no discussion of *Stuart* in *Fabre,* and the supreme court does not reverse itself *sub silentio. Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself *sub silentio*"). Thus, the principle established in *Stuart* remains the law: an alleged independent and subsequent tortfeasor's negligence does not diminish the liability of the original tortfeasor who caused the injury to occur.

We agree with the analysis and rationale of *Caccavella v. Silverman*, 814 So. 2d 1145, 1148-49 (Fla. 4th DCA 2002), *review denied*, 860 So. 2d 976 (Fla. 2003), and find it applicable here, that a physician's alleged negligence in the post-operative treatment of a patient does not diminish or absolve the negligence of the original physician:

> In Florida, an initial tortfeasor "may be held responsible for all subsequent injuries including those caused by medical negligence." *D'Amario v. Ford Motor*

18

*Co.,* 806 So. 2d 424, 435 (Fla. 2001) (citing among others *Stuart v. Hertz Corp.,* 351 So. 2d 703 (Fla. 1977)). This rule applies "even where the initial tortfeasor is a physician as well." *Letzter v. Cephas,* 792 So. 2d 481, 485 (Fla. 4th DCA)(citing *Davidson v. Gaillard,* 584 So. 2d 71, 73–74 (Fla. 1st DCA 1991), *disapproved on other grounds by Barth v. Khubani,* 748 So. 2d 260 (Fla. 1999)), *review granted,* 796 So. 2d 535 (Fla. 2001). . . . "Joint tortfeasors are usually defined as two or more negligent entities whose conduct combines to produce a single injury." *D'Amario,* 806 So.2d at 435 n.12 (citing *Davidow v. Seyfarth,* 58 So. 2d 865, 868 (Fla. 1952)). As this court has recently held, whether defendants are joint tortfeasors is ordinarily a question of fact. *See Letzter,* 792 So. 2d at 486. Nevertheless, when determining the efficacy of a release of one tortfeasor as it applies to other tortfeasors, the trial court must necessarily consider the "facts" to be those alleged in the complaint, in light of the plaintiff's theory of liability. In these circumstances, the plaintiff is in control of the allegations in the complaint, as well as accepting or rejecting the terms of any release entered into with one or several of the tortfeasors involved.

814 So. 2d at 1146-48.

Specialty asserted Heartland was a nonparty joint tortfeasor subject to allocation of fault. But the facts simply do not bear that out, even viewing the record in a light most favorable to Specialty. The facts here establish that at most Heartland was a subsequent, independent tortfeasor that may have aggravated the injury caused by Specialty, but under *Stuart,* Specialty is liable for all damages resulting from its negligent treatment of Mr. Barth that caused the deep-tissue pressure ulcer. Whether Heartland's medical treatment may have exacerbated that injury is not legally relevant under *Stuart.*

Section 768.81, Florida Statutes, which provides for the allocation of fault among joint and several tortfeasors, does not apply to independent and subsequent tortfeasors. Therefore, the statute did not abrogate the decision in *Stuart.* And as we note, the supreme court in *Fabre* neither discussed *Stuart* nor ever implied that the statute abrogated its decision or applied to independent

19

tortfeasors, nor should it logically so apply. Independent tortfeasors, such as Specialty and Heartland, assuming Heartland was a tortfeasor, are independently liable for their separate and distinct acts of wrongful conduct. They are not joint tortfeasors involved in a single incident sharing liability for portions of the fault of that incident.

We therefore reverse and remand with direction that Heartland be removed from the verdict and final judgment as a non-party and that all damages be assessed against Specialty. *Jackson County Hosp. Corp. v. Aldrich,* 835 So.2d 318, 332 (Fla. 1st DCA 2002) (reversing and directing verdict for one defendant deemed partially at fault and affirming other defendant's liability, remanded with direction to award all damages against remaining party at fault).

REVERSED and REMANDED.

LEWIS and ROBERTS, JJ., concur.

––––––––––––––––––––––––––

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

––––––––––––––––––––––––––

Jennifer Cates Lester and John D. Jopling of Dell Salter, P.A., Gainesville, for Appellant/Cross-Appellee.

Thomas S. Edwards of Edwards & Ragatz, P.A., Jacksonville; Rebecca Bowen Creed of Creed & Gowdy, P.A., Jacksonville, for Appellee/Cross-Appellant.